**INGERSOLL MILLING MACHINE CO.
v. GENERAL MOTORS CORP.**
No. 50 C 98.

United States District Court,
N. D. Illinois, E. D.
Sept. 8, 1952.

Alwin F. Pitzner and Richard Russell Wolfe, of Firm of Carlson, Pitzner, Hubbard & Wolfe, Chicago, Ill., for plaintiff.

Whittemore, Hulbert & Belknap, Detroit, Mich., Davis, Lindsey, Hibben & Noyes, Chicago, Ill., for defendant.

BARNES, Chief Judge.

This is a suit by The Ingersoll Milling Machine Company, an Illinois corporation having its principal office and place of business at Rockford, Illinois (hereinafter sometimes called "Ingersoll"), against General Motors Corporation, a Delaware corporation, qualified to do business in Illinois and having a regular and established place of business in LaGrange, Illinois (hereinafter sometimes called "General"). Ingersoll alleges that it is the assignee and owner of United States Letters Patent No. 2,186,-417, issued January 9, 1940, on an application filed December 19, 1938, by Charles E. Kraus on a Cutter; that on December 7, 1945, Ingersoll filed in the Patent Office disclaimer to Claims 3, 6, 7, 8 and 9 of said Letters Patent; that subsequent to the issuance of said letters patent and within the last six years and prior to the filing of the complaint General has obtained from Goddard & Goddard Company of Detroit, Michigan (hereinafter sometimes called "Goddard") certain milling cutters, and within this District and Division has infringed said letters patent by using said milling cutters and threatens to continue to do so; that it (Ingersoll) has given notice to the public of its patent by affixing the required statutory patent notice on all cutters disclosed and claimed in said patent and sold by it, and that it has given written notice to General of its infringement. Ingersoll prays preliminary and final injunctions, an accounting of profits and damages, and assessment of costs and attorneys' fees.

Ingersoll is a manufacturer of machine tools and cutters, including the milling cutter of the patent. It markets the latter as its so-called "Shear Clear" cutter. General is charged as an infringer by reason of its use of certain so-called "Free Clear" cutters purchased from Goddard.

The patentee, in his patent, states the objects of his invention as follows:

"This invention relates to a rotary cutter for removing a layer of metal from a work piece to form a smooth surface thereon during relative feeding movement between the rotating cutter and the work piece parallel to such surface. The invention has to do more particularly with cutters of this type in which the nose on each blade is beveled or set at an acute angle relative to the plane of rotation of the cutter to reduce the shock on the blades in entering the work and to prolong the tool life.

\* \* \* \* \* \*

"I have discovered that such beveling of the blades is accompanied by unexpected and extremely unfavorable changes in the cutting angles which are actually effective on the beveled portions of the edges where the major cutting action occurs. As a result, the cutting efficiency is reduced substantially, and in addition there is an objectionable increase in the end thrust on the cutter and a corresponding increase in the forces tending to distort the work and produce inaccuracy in the finished work surface.

"The present invention is based on this discovery and its general aim is to provide a beveled blade metal removing cutter in which the position of each blade relative to the cutter body is correlated with the bevel on the blades in a novel manner such that the beveled edge portions act on the work at effective rake and shear angles which are proper for efficient cutting of the work material to be operated on.

"Another object is to provide a cutter of the above character which not only overcomes the limitations inherent in beveled blade cutters heretofore used, but also enables the degree of blade beveling to be varied widely and actually utilizes the beveled character of the blades to perform new and advantageous functions including control of the thrust on the cutter during operation thereof and of the direction in which the chips are thrown.

"A further object is to provide a cutter in which the active edges project shorter distances from the cutter body and therefore are supported more ruggedly than in prior cutters while at the same time providing for proper disposal of the chips.

"The invention also aims to provide for operation of the main or bevel edges of the cutter at the proper effective cutting angles while at the same time maintaining proper rake and shear angles effective on the secondary cutting edges by which the finished work surface is determined."

"Other objects and advantages of the invention will become apparent from the following detailed description taken in connection with the accompanying drawings, in which

"Figure 1 is a side elevational view of a face milling cutter embodying the novel features of the invention, the cutter being shown in operation on a work piece shown in section.

"Fig. 2 is a side view of one of the cutter blades illustrating its position relative to the cutter body.

"Fig. 3 is a plan view of the blade shown in Fig. 2.

"Figs. 4 and 5 are sectional views taken along the lines 4–4 and 5–5 of Fig. 1.

"Fig. 6 is a fragmentary perspective view of a work piece in the course of milling the same by the improved cutter.

"Fig. 7 is an end view of the cutter.

"Fig. 8 is a fragmentary diametrical section through the cutter and a work piece.

"Fig. 9 is a fragmentary plan view of a work piece and cutter blades operating thereon showing the manner of chip flow.

"Figs. 10 and 11 are diagrams of the forces applied to the cutter during operation thereof.

"Fig. 12 is a chart showing the relation of apparent rake and shear angles.

"Figs. 13 and 14 are charts showing the relation of apparent and effective rake and shear angles in cutters having 30 and 45 degree bevel angles respectively.

"Fig. 15 is an elevational view of an ordinary face mill.

"Fig. 16 is a fragmentary sectional view taken along the line 16–16 of Fig. 15.

"Fig. 17 is a fragmentary elevational view of the cutter shown in Fig. 15 with the blades beveled.

"Figs. 18 and 19 are sections taken respectively along the lines 18–18 and 19–19 of Fig. 17.

"Fig. 20 is a view similar to Fig. 18 of a cutter having a smaller bevel angle."

Fig.8

Fig.10

Fig.9

Fig.11

Fig.12

RAKE ANGLE

SHEAR ANGLE

*Fig.13*

EFFECTIVE RAKE (er)
APPARENT SHEAR (as)
APPARENT RAKE (ar)
EFFECTIVE SHEAR (es)
APPARENT SHEAR (as)

13
29a
12

FOR 30° BEVEL

*Fig.14*

EFFECTIVE RAKE (er)
11
APPARENT SHEAR (as)
APPARENT RAKE (ar)
EFFECTIVE SHEAR (es)

30

FOR 45° BEVEL.

*Fig.15*

*Fig.16*

*Fig.17*

*Fig.18*

*Fig.19*

*Fig.20*

The patentee, in order to describe his invention in his patent, first describes an ordinary face milling cutter and its deficiencies, as follows:

"As shown in Fig. 15, the blades of an ordinary face mill are generally formed with side or main cutting edges 2 and face or finishing edges 3 which project from the periphery and end of the cutter body 4 and merge at a point or nose 5. Since the main cutting burden is on the edges 2, these are positioned to act at rake and shear angles r and s known to be most effective for cutting the metal on which the cutter is to operate. These angles are determined solely by the position of the leading or cutting face 6 on each blade relative to the cutter axis, the shear angle s which is effective on the edge 2 being the angle of intersection between the cutter axis and the plane of the cutting face 6 (see Fig. 15). The rake of the edge 2 is the angle between said plane of the blade face 6 and a radius through the point 5 of intersection between the face and side edges 3 and 2 (see Fig. 16). This angle must of course be of positive sign, that is, the cutting face 6 must be displaced back of a radial line 7 through the cutting edge 2. Or in other words, the entire blade 1 is disposed behind a radius 8 of the cutter (see Fig. 16) parallel to the cutting face 6, this being a significant characteristic of ordinary face milling cutters.

"The rake and shear angles employed will, of course, vary with different cutting and work materials, the approximate angles ordinarily employed for different kinds of cutters and materials being plotted in Fig. 12. It will be seen that most conventional cutters fall within the area enclosed by the dotted line in Fig. 12. Typical of such cutters is the one shown in Fig. 15 and indicated at 9 (Figs. 15 and 16) having 10 degree rake and shear angles effective on the edges 2. Such a cutter would be used for milling steel or cast iron using high speed steel blade edges.

"For the purposes mentioned above, the blade tips 5 of cutters of the above character are frequently cut away to form cutting edge portions 10 (see Figs. 17 and 19) disposed at a bevel angle b relative to the plane of rotation of the cutter. In such a cutter, the cutting efficiency is no longer determined by the rake and shear angles effective on the edges 2 but rather on those effective on the bevel edge portions 10 by which the main cutting action is produced. I have discovered that such beveling produces wide changes in the effective rake and shear angles at which the bevel portions 10 operate, and that the difficulties attending the use of beveled nose cutters are attributable to these changes. Thus, both the rake and shear angles er and es which are actually effective and the bevels will be determined not only by the position of the cutting face 6 which controls the apparent rake and shear angles as above described but also by the amount of the bevel. Assume, for example, that the face mill shown in Figs. 15 and 16 having blades positioned to provide an apparent rake angle r and an apparent shear angle s of 10 degrees on the side cutting edges 2 are beveled at an angle b of 45 degrees which is common in practice. The effective angles in such a case may be determined from Fig. 14 wherein a chart showing effective angles for cutters with a 45 degree bevel angle is superimposed upon a chart of apparent rake angles. Thus, a cutter having apparent rake and shear angles of 10 degrees would fall at point 11. Reading from this point parallel to the effective rake and shear base lines, it will be found that the rake angle er effective on the bevels 10 is increased to 17 degrees and that the effective shear angle es is zero. If a smaller bevel angle is employed, the effective rake angle will be increased and the shear angle will not only be reduced materially but its sign will be changed. Thus, as shown in

Fig. 20 and by the chart Fig. 13, the same cutter with a bevel angle of 30 degrees will produce a negative shear angle of four degrees. Such unfavorable angles obviously reduce the cutting efficiency. The shear is actually destroyed or reduced to an objectionable degree, and in cases where its sign is changed, the chips are caused to flow inwardly toward the cutter axis thereby necessitating greater chip clearances at the expense of body strength and blade rigidity. Also, the end thrust is increased materially and this results in a corresponding reduction in the accuracy of the finished work surface. In many instances, these difficulties more than offset the advantages of beveling the blade noses and place fixed limitations on the use of beveled cutters and on the amount of bevel which may be employed."

The patentee then describes his patent generally as follows:

"In one of its aspects, the present invention aims to overcome the detrimental action above referred to and to correlate the shape and position of the cutter blades with the bevel angle desired to be employed in a novel manner such that the beveled edge portions will operate on the work at effective shear and rake angles proper for the work material with which the cutter is to be used. Generally stated, this is accomplished by positioning the blades so that the apparent rake angle, which as set forth above is determined solely by the position of the cutting face of each blade relative to the cutter axis, is of negative sign and the apparent shear angle, which also is controlled by the cutting face position, is of the proper sign and magnitude to produce the desired effective rake and shear angles, the effective rake angle being of positive sign. That is to say, the apparent angles fall in the lower right hand quadrant of the charts Figs. 12 and 13 as indicated, for example, by the points 12 and 13 and to the right of the effective shear base line.

"In another aspect, the invention also contemplates increasing the magnitudes of the shear and negative rake angles to such an extent that the effective shear angle is substantially greater than that required for efficient cutting but such as to control the end thrust on the cutter and the direction of chip flow. For example, for a cutter with blades of tungsten carbide and a 30 degree bevel angle for cutting cast iron and steel, an apparent negative rake angle of 20 degrees and a positive shear angle of 20 degrees would be desirable as indicated at 12 (Fig. 13). The beveled edge portions of such a cutter would act on the work with an effective positive rake angle of 8 degrees and a shear angle of 29 degrees. Or, if high speed steel is employed, apparent rake and shear angles of 10 and 30 degrees would be used as indicated at 13 giving effective rake and shear angles both of 24 degrees. These are merely typical of the various angle combinations which might be employed depending on the cutting and work materials to be used and whether the cutter is to be used as a special or general purpose tool."

Finally, the patentee specifically describes his invention. The specific description is detailed, and consequently long. The writer does not have sufficient ingenuity to devise a shorter description. He has underscored what he believes to be the heart of the description. But the whole is necessary to an understanding thereof. It is as follows:

"Referring now to Figs. 1 to 9, the cutter shown for purposes of illustrating the invention is of the inserted blade type having a body 15 intended to rotate about a central axis 16 and formed between its periphery 17 and its end face 18 with a frusto-conical surface 19 disposed at an angle corresponding to the bevel with which the cutter blades or teeth 20 are to be formed. The latter are received in slots 21 with an end portion projecting beyond the end and conical surfaces 18

and 19. The blades may be suitably wedged in the body slots, or if desired, they may be formed integral with the body. Preferably, they are fastened in place by a locking means (not shown) such as that forming the subject matter of Patent No. 2,173,868.

"The flat leading or cutting face 22 of each blade 20 terminates in a side or peripheral edge portion 23 corresponding in position to the main cutting edge of an ordinary face mill, an end portion 24 disposed parallel to the plane of rotation of the cutter and defining an end cutting face that determines the finished work surface 29, and a bevel portion 25 which preferably is substantially straight and joins the portions 23 and 24 at a bevel angle b of the desired magnitude. These beveled edges perform the main cutting action and cooperate to define a generally frusto-conical cutting face which has an axial height greater than the thickness of the metal layer 33 to be milled from the work. The blades are of course shaped to afford proper relief for the cutting edges and the body may be cut away as indicated at 26 to provide small chip clearance recesses immediately in advance of the bevel edge portions 25.

"The manner of using such a cutter to mill a layer 33 of metal from a work piece is illustrated in Figs. 1, 6 and 8. The cutter, disposed in a suitable machine tool with its end face coincident with the work surface 29 to be produced, is rotated about the axis 16 while being relatively fed along the finished surface in the directions indicated in Fig. 6. The bevel edges 25 cut through the work transversely of the direction of feed and remove successive chips or metal layers 31 (Fig. 8) along surfaces 32 inclined at the bevel angle to the finished surface. The edges 25 thus sustain the main cutting burden. The finishing edges 24 sweep across the work in the plane of the final surface and thus smooth off the zone machined by the main edges,

thereby determining the position and finish of the final surface.

"As set forth above, the apparent rake angle ar of each blade is determined solely by the position of its front or cutting face 22 and is the angle which would be effective on the main cutting edges in the absence of the bevel. To establish a negative value for this angle as contemplated by the invention, each blade 20 is positioned in the body so that the inner end $24^a$ of the finishing edge portion 24 of the blade edge leads the outer end $24^b$ instead of trailing the outer end as in the case of an ordinary face milling cutter (Fig. 16). Otherwise stated, the plane of the cutting face 22 of the blade, which plane includes the edge 24, is disposed a substantial distance in advance of a radius 27 (Fig. 3) of the cutter parallel to the cutting face instead of behind such a radius as in an ordinary face mill (Fig. 16). The apparent shear angle as used is of the same sign as in an ordinary face mill, this being obtained by inclining the cutting face 22 of each blade at the correct angle upwardly and away from the cutter axis as illustrated in Fig. 2.

"If, as in the cutter illustrated, the bevel angle b is 30 degrees and the cutting faces 22 are positioned to produce a negative apparent rake angle ar of 20 degrees combined with an apparent shear angle as of 20 degrees, the rake angle er, which is actually effective on the beveled edge portion 25 during operation of the cutter, will be 8 degrees (Fig. 4), the angle being determined by following along the chart (Fig. 13) perpendicular to the effective rake base line from the point 12. As shown in Fig. 4, the sign of this effective rake angle will be positive because the cutting face 22 lies behind a perpendicular to the beveled work surface 32 through the edge 25. It will be observed that because of the bevel, the sign as well as the magnitude of the effective rake angle is influenced by the apparent shear angle as well as the apparent

rake angle. As shown in Fig. 13, the effective rake will be of positive sign for combinations of apparent shear and negative rake angles which fall to the right of the effective shear base line. Also, the magnitude of the effective rake will be proportional to the magnitude of the apparent shear angle.

"The sign of the shear angle is of special importance in the present instance. It is such that the inner end $25^a$ of the bevel edge portion 25, which end is disposed adjacent the finished work surface 29 during operation of the cutter, always lead the other or outer end $25^b$. That is to say, the inner end $25^a$ is the first part of the beveled edge to enter the work (see Fig. 9), the zone of engagement with the work progressing outwardly along the bevel so that after full entry into the work, the zone of engagement indicated at 28 (Fig. 6) extends along the beveled work surface 32 formed by the blade and upwardly and backwardly relative to the finished surface 29 and the direction of cutter rotation. With the blades thus located, the sign of the shear angle which is effective on the bevels 25 will be referred to herein as positive, being thereby distinguished from cases such as is shown in Fig. 20 where the outer end of the bevel leads the inner end.

"The magnitude of the shear angle $es$ which is effective on the bevel edge portions 25 is also influenced by the size of the apparent rake angle $ar$. For angle combinations falling between the effective shear base line and a line $29^a$ (Fig. 13), the effective shear angle is larger than the apparent shear angle. As will appear later, the blades 20 are preferably located so as to produce a shear angle effective on the bevel edge portions 25 of fifteen degrees or more.

"With negative apparent rake and positive apparent shear angles of 20 degrees as indicated by point 12 (Figs. 12 and 13), the effective shear on the bevel 25 would be 29 degrees. Thirty degrees apparent shear and ten degrees negative apparent rake as indicated at

point 13 would produce 24 degrees positive effective rake and 24 degrees shear. Of course, the edge portions 25 may be set at any other bevel angle that may be desired, the position of the blades in the cutter body being correlated with the degree of bevel to produce effective rake and shear angles at least as large as those ordinarily used in practice considering the known characteristics of the work and cutting materials to be used. For example, with a 45 degree bevel angle which might be used in order to increase the permissible depth of cut, a positive rake angle of 8 degrees and an effective shear of 29 degrees would be obtained by employing apparent angles of 22 degrees shear and minus 13 degrees rake as indicated by the point 30 (Fig. 14) which compares with the point 12 (Fig. 13) for a 30 degree bevel.

"In constructing a cutter in accordance with the present invention, the correct positions of blades are determined by first selecting the proper effective rake and shear angles which are of course controlled by the cutting material to be employed and the work material upon which the cutter is to operate. With these angles and the bevel angle known, the proper apparent angles may be calculated or ascertained from a chart of the character shown in Figs. 13 and 14. The blade slots 21 would then be located in the cutter body so as to position the cutting faces 22 of the blades at such apparent angles.

"By thus selecting apparent rake and shear angles different from the effective angles desired and by correlating the magnitudes and signs of the apparent angles, not only with the desired effective angles but also with the amount of the bevel employed, the bevel edge portions 25 by which the major cutting action is produced may be made to act at angles most advantageous for efficient cutting with given work and cutting materials. For the same reason, no limitation is placed on the amount

of the bevel, and the angle selected may be varied as desired to meet special operating conditions. Therefore, it is possible with the present invention to employ bevel angles much smaller than those heretofore used in practice. (Emphasis supplied) With a thirty degree bevel, for example, the width of the chips 31 (Figs. 8 and 9) may be doubled as compared to ordinary face milling practice thereby enabling the maximum permissible rate of feed to be increased correspondingly.

"Since the magnitudes and signs of the effective rake and shear angles may be controlled as desired independently of each other and of the bevel angle, the beveled edge portions 25 may be utilized to advantage in performing additional advantageous functions. One of such functions is to control the direction of flow of the chips 31 in a manner such as to avoid the necessity of providing deep clearance grooves as is common in ordinary face milling practice. To this end, the effective shear angle es is made of positive sign and of sufficient magnitude to insure an outward chip flow and effective disposal of the chips.

"To provide a shear angle of positive sign, the blades are positioned as above set forth with the inner end 25a of the beveled portion 25 leading the outer end 25b during rotation of the cutter (see Figs. 3 and 9). With a shear angle of this sign, the chip which is formed by each edge 25 is induced to flow outwardly and to take a spiral helical shape as illustrated in Fig. 9.

"In order to utilize advantageously this tendency of the chips to flow outwardly, the magnitude of the effective shear angle is increased to a value substantially above those ordinarily used in face milling practice. In the exemplary cutters described above, effective shear angles of 29 and 25 degrees are provided. These compare with shear angles of 15 degrees which are about the maximum ordinarily employed when machining steel or cast iron with

ordinary face mills (Fig. 15) and with the much smaller and even reversed shear angles which are effective when such face mills are beveled (Figs. 18 and 20). With an effective shear angle of substantially more than 15 degrees, the chips 31 are thrown outwardly at a correspondingly large angle, and, in spite of any tendency to roll up as illustrated in Fig. 9, are thrown clear of the cutter body and out beyond the path of the cutter teeth regardless of the thickness of the metal layer being removed from the work. The necessity of providing wide and deep chip grooves between adjacent cutter teeth is thus avoided, thereby enabling the rigidity of the blade mounting to be increased proportionately. Accordingly, the blades 20 need not project beyond the periphery 17 of the cutter body and the conical surface 19 and end face 18 may be extended close to the blade edges 24 and 25. For example, as shown in Fig. 8, the edges 24 project beyond the cutter body a distance less than the total thickness of the metal layer 33 removed from the work and less than the vertical height of the frusto-conical cutting face defined by the beveled portions 25. By thus supporting the blades close to their active cutting edges, extreme rigidity of the mounting is obtained and blade chatter is reduced materially producing a smoother cutting action and prolonging the blade life.

"As pointed out above, the operation of any face mill having beveled blades is accompanied by the application of a substantial end thrust on the cutter and an equal distorting force on the work. This end thrust indicated at E is inversely proportional to the magnitude of the angle b at which the bevel blade edges 25 are disposed as will be apparent from the force diagrams (Figs. 10 and 11). Thus each cutter blade is subjected to a tangential force T and a so-called radial force R which latter force is, in the case of the beveled edge 25, directed downwardly at right angles to the cutting edge 25. As is well

understood in the art, this radial force R may be expressed as a function K of the tangential force T, K being a constant determined mainly by the rake angle employed and the work material being cut and being on the order of .3 for soft steel, .4 for hard steel, and .5 for cast iron. Accordingly, the vertical component of the force R and therefore the end thrust E on the cutter is equal to KT cosine $b$. It will thus be seen that the end thrust increases as the bevel angle decreases. This accounts for the fact that bevel angles of less than forty-five degrees are seldom used in practice.

"Owing to the shear angle $es$ at which the beveled edge portions 25 act on the work, a side force S is exerted on each cutter blade, this being a component of the tangential force T and directed longitudinally of each edge portion 25. The magnitude of this side force is T sine $es$. With the blades positioned as above described to produce an effective shear angle of positive sign, the side force S will be directed outwardly along the blade edge 25 and will have an upwardly directed component C opposing the end thrust E which, as explained above, is due to the bevel angle $b$. The magnitude of the component C is equal to T sine $es$ sine $b$.

"From the foregoing, it follows that by employing an effective shear angle $es$ of the proper sign and of sufficiently high magnitude, any proportion of the objectionable end thrust due to beveling of the cutter may be counteracted. Equating T sine $es$ sine $b$ with KT cos $b$, it will be seen that the end thrust E will be overcome when sine $es$= K cot $b$. For example, if the value of K is .3 and the bevel angle is 30 degrees, the end thrust on the cutter may be reduced to zero by increasing the effective shear angle to 30 degrees. Or for a 45 degree bevel and with K equal to .4, the thrust due to the bevel would be neutralized at an effective shear angle of approximately 24 degrees and a major portion of the thrust will be counteracted with a positive effective shear of more than fifteen degrees.

"By employing a relatively high shear angle and correlating the magnitude thereof with the degree of bevel desired, the thrust on the cutter due to beveling of the main cutting edges may be controlled. Therefore, bevel angles substantially smaller than those heretofore used in practice may be employed without the usual attending difficulties.

"The use of a negative apparent rake angle and a shear angle of substantial magnitude for the purposes set forth above does not impair the cutting efficiency of the auxiliary edges 24 which clean up the work and determine the finished work surface 29. Such edges, of course, act at a rake angle equal to the apparent shear angle of the main cutting edges 25, this being of positive sign as is evident from the inclination of the blade face 22 (Fig. 2) by which the apparent angles are determined. Likewise, the apparent rake angle of the main cutting edge, as previously defined, is the effective shear angle of the finishing edge 24. Owing to the negative sign of the apparent rake angle, the outer end 25$^a$ leads the inner end of the edge 24 (see Fig. 3). Thus, a shear angle of positive sign is effective on the finishing edge 24 so that this edge actually assists the main or bevel edge portions 25 in directing the flow of chips away from the cutter body. For example, with the teeth of the cutter positioned to provide an apparent negative rake angle of thirteen degrees and an apparent shear angle of twenty-two degrees, as indicated at point 30 (Fig. 14), the finishing edges 24 would act at a positive rake angle of twenty-two degrees and a positive shear angle of thirteen degrees. The use of such a relatively high rake angle is permissible because of the comparatively low cutting burden on the finishing edge portions 24.

"From the foregoing, it will be seen that the present invention not only overcomes the objections to prior cutters having beveled main cutting edges

but actually utilizes the inherent characteristics of such edges to produce new and advantageous functions. The invention provides for optimum cutting efficiency by enabling the proper rake and shear angles to be made effective for any given bevel. The degree of bevel may be varied as desired. By controlling the flow of chips, the rigidity of the blade mounting is increased materially resulting in smoother cutting action and longer tool life. Finally, the magnitude of the distorting forces on the work may be reduced to any desired degree. These advantageous characteristics have been established in actual service use of the improved cutter."

Claims 1, 2, 10, 12, 15, 16 and 19 are in suit. They are as follows:

"1. A cutter having a rotary body, a plurality of teeth projecting therefrom and having substantially straight cutting edges defining a generally frusto-conical main cutting face, the leading face of each tooth being disposed at a negative rake angle and a shear angle correlated with each other and of sufficient magnitude to produce a positive rake angle and a sheer angle of more than fifteen degrees effective on said cutting edges during operation of the cutter, and secondary cutting edges on said teeth determining the work surface finished by the cutter."

"2. A face milling cutter comprising a rotary body and a plurality of teeth projecting therefrom and having end edges defining an end cutting face parallel to the plane of rotation of the cutter and side edges defining a generally frusto-conical cutting face, each of said end edges being disposed with its inner end ahead of its outer end and each of said side edges being positioned to act at an effective shear angle of more than fifteen degrees."

"10. A multiple blade cutter for removing a layer of metal from a work piece to form a smooth finished surface thereon by relative feeding movement between the cutter and the work piece parallel to said surface, said cutter comprising a rotary body, blades projecting therefrom and each having a finishing cutting edge movable along said finished surface during operation of the cutter and main cutting edges disposed at a bevel angle to said first edges, the cutting faces of said blades being positioned at an apparent rake angle of negative sign and at a shear angle both related with each other and correlated in magnitude to the amount of said bevel angle so that the rake and shear angles effective on said main edges during operation of the cutter are of positive sign and magnitudes suited for efficient cutting of predetermined metal."

"12. A cutter for removing a surface layer of predetermined metal from a work piece to form a smooth surface thereon by relative feeding movement between the rotating cutter and the work piece parallel to said surface, said cutter comprising a rotary body, teeth projecting from said body and having cutting faces each disposed at an apparent rake angle of negative sign and at an apparent shear angle, main cutting edges on said teeth each disposed relative to said work surface at an acute bevel angle coacting with said apparent angles to convert the rake angle into a positive angle effective on the bevel edge during operation of the cutter and having sufficient magnitude to suit the known cutting characteristics of said metal, and secondary cutting edges on said teeth acting during operation of the cutter to smooth off the zone of the work machined by said main edges."

"15. A cutter for removing a layer of predetermined metal from a work piece to form a smooth finished surface thereon by relative feeding movement between the rotating cutter and the work piece parallel to said surface, said cutter comprising a rotary body, teeth projecting from said body and each having a main cutting edge disposed at a bevel angle to the work surface formed during operation of the cutter, a second edge adapted to smooth off the

work zone machined by the main edges, and a cutting face on each tooth positioned at an apparent rake angle of negative sign and at a shear angle of related magnitude coacting with said bevel angle to cause said edges to act on the work at effective rake and shear angles of positive sign and of magnitudes sufficiently large for efficient cutting of said metal and to cause the chips to be thrown away from and ahead of said cutter body during operation of the cutter.

"16. A cutter for removing a layer of given work material from a work piece by relative movement between the rotating cutter and the work piece along the finished surface to be formed, said cutter comprising a rotary body, an annular series of teeth projecting from said body, main cutting edges of material of known cutting characteristics formed on said teeth at a bevel angle relative to the work surface formed by operation of the cutter with the end of each edge adjacent said work surface leading the other end during rotation of said body, and secondary cutting edges on said teeth for finishing the zone of the work machined by said main edges, the cutting face of each tooth being positioned at a negative apparent rake angle and a shear angle acting conjointly with said bevel angle to cause cutting engagement between said main edges and the work at a positive effective rake angle sufficiently large for efficient cutting of said work material and at an effective shear angle of sufficient size to cause the formation of spiral-helical chips during operation of the cutter and flow of such chips away from said body."

"19. A cutter for removing a layer of material from a work piece by relative movement between the rotating cutter and the work piece along the finished surface to be formed, said cutter comprising a rotary body, an annular series of teeth projecting from said body, main cutting edges on said teeth disposed at a bevel angle relative to the work surface formed by opera-

tion of the cutter with the end of each edge adjacent said work surface leading the other end during rotation of said body, the cutting face of each tooth being positioned at a negative apparent rake angle and a positive apparent shear angle coacting to cause cutting engagement between the work and said main edges at a positive effective rake angle sufficiently large for efficient cutting of said work material and at a positive effective shear angle, and second cutting edges on said teeth for finishing the zone of the work machined by said main edges and acting on the work at positive rake and shear angles corresponding in magnitude to said apparent shear and rake angles respectively."

The defendant set up in its answer many defenses. At the beginning of its brief, filed after the hearing of evidence was concluded and before final arguments, the defendant limited the issues by the following statement:

"The court should be advised at the outset that each of defendant's defenses are based upon the Ingersoll 'W' type beveled edge face mill cutter, except for the patentee's failure to comply with the requirements of Revised Statute 4888. Thus, defendant urges that if its cutters infringe any one or more of the claims in suit, then the 'W' type beveled edge cutter anticipates such claim or claims for the accused cutters and the 'W' type beveled edge cutters are basically the same. Defendant contends that the claims of the patent in suit are anticipated by the 'W' type beveled edge cutter. The various defenses based upon the alleged disclaimer of some of the claims of the patent in suit are dependent upon the 'W' type beveled edge cutter, so defendant will discuss first the patent in suit and then the evidence relating to the 'W' type cutter."

As the final arguments proceeded, it developed that there were but two principal issues. First, Is the patent in suit anticipated by the prior art? In the final briefs and arguments the only prior art relied

upon as anticipating were cutters made and sold by the plaintiff during the period 1915 to 1929, and which the plaintiff designated as its "Type W." These cutters were intended and sold for use in face milling aluminum. Second, Is the patent in suit invalid because it does not comply with Section 33, Title 35 U.S.Code? The defendant contends that the specification of the patent, and likewise the claims, are deficient in failing to set clear numerical "limits" for angles to be employed on the blades, and that, lacking such limits, one cannot tell whether a particular cutter is inside or outside the claims, nor how to build a Kraus cutter at all.

Some questions that the court regards as subordinate were considered in argument. They will be mentioned later in this memorandum.

The art of milling cutters is an old one. The Encyclopedia Britannica (Vol. XXVII, 11th Ed., p. 32) states that the French engineer Jacques de Vaucanson (1709–1782) is credited with having made the first milling cutter, and that the first milling machine in this country was installed at a Connecticut gun factory in 1818.

In all milling cutters a cutter "body" presents a circular series of "teeth." As the cutter revolves, those teeth cut their way through the metal somewhat in the manner of a very thick circular saw. At an early date cutters of the "inserted blade" types were made. In these, each tooth consisted of a separate, block shaped blade suitably locked in a revolving cutter "body." The Ingersoll Company itself began making such inserted blade cutters in the early 1900s. In the course of time a variety of types of milling cutters were developed in the art. They came to be used for quite distinct purposes. Those types include face milling cutters, side milling cutters, plain milling cutters, staggered-tooth side mills, face and end mills, profile cutters, formed cutters, and others.

The cutter of the patent in suit falls into the general class of "face mills" or face milling cutters. Such cutters are used to cut a layer of metal from a workpiece, leaving a smooth surface on it. Sometimes the operation is referred to as "scalping." The cutter revolves about an axis standing up at right angles to the surface being fashioned.

A conventional face milling cutter consists of a "body" and "inserted blades" or teeth. The teeth consist of a series of rectangular blades set in the slotted cutter body. Each blade's outer edge constitutes its main cutting edge. Each successive blade edge slices a chip off the front face of the ledge of stock being removed. A progressively enlarging expanse of machined surface is thus produced as the cutter advances. That surface is swept by the bottom edges of the blades which thus constitute "secondary" cutting edges for cleaning up the surface. It was customary in such a conventional cutter to locate the slots so that each blade would be positioned to afford desired angles of "rake" and of "shear" for its main cutting edge. The "rake" of the blade, like the rake of a ship's mast, is its tilt or lean with respect to the direction of motion. The greater the rake of the blade back away from the cutting edge, the more the edge tends to "hook" into the work. When the blade leans back from the cutter edge it is said to have a positive rake; when it leans forward it is said to have a negative rake.

The "shear" of the blade is the sidewise cocking of it whereby the cutting edge is set diagonally of the direction of travel and is thus caused to enter the work with a shearing or sweeping motion rather than with an abrupt impact along its whole length. Again the angle may be either positive or negative. In the case of the "shear" angle, a cant in direction to force the chips away is called a positive shear, the opposite a negative shear.

It was customary in the art long before Kraus to set blades of face mills to afford a selected rake and shear for the main cutting edge.

The conventional cutter sometimes has the corners or noses of the blades beveled. This is done to reduce the shock on the blades in entering the work and to prolong the tool life.

Cutter designers for years have made conventional cutters. They have had a wealth of data on what rake and shear angles to use under all conditions. They knew how to set a blade so as to get the desired rake and shear angle on the main cutting edge. They had often cut bevels, sometimes deep bevels, from the blade corners. It helped keep those corners from burning and breaking. But no one knew prior to Kraus that when you put on a bevel its edge no longer has the rake and shear angles which had been imposed on the previous main cutting edge. For twenty years or more people did not see it. They did not perceive what had happened. It was not denied on the trial that the introduction of the bevel does alter radically the rake and shear angles which are effective on the bevel edge thus produced. The claim of the patent is that Kraus was the first to discover that the introduction of the bevel brought about the radical alteration in the effective rake and shear.

Kraus ascertained that in order to afford the requisite effective angles on the bevel cutting edge,—the angles specified by the hand books for efficient cutting of a given material,—the apparent angles of the blade had to be swung far away from the previous values. As the patent points out, the apparent rake angle is made of negative sign to produce an actual positive rake on the bevel edge. Kraus also worked out the charts of Figs. 13 and 14 of the patent by virtue of which anyone can select a bevel angle, look up in a handbook the effective angles best suited for the material of blade and work, and then pick off the quite different apparent angles at which the blade must be set.

Kraus' discovery was important for several reasons:—First, with a bevel cutting edge the blade is inherently stronger, less subject to burning and breakage of the corner which the bevel eliminates; Second, by using a bevel cutting edge as the primary cutting edge the geometry is such that there is a greater advance per tooth for the same thickness of chip; and Third, with a bevel cutting edge the chips can be induced to flow outward in a smooth helical spiral by increasing the effective shear angle "to a value substantially above those ordinarily used in face milling practice." The evidence shows that by doing the cutting on the bevel edge Kraus was able to employ effective shear angles so high that it would be utterly impractical to use them on the conventional peripheral cutting edge.

The evidence is clear that the cutter of the patent in suit was, performance-wise, a long step forward.

A witness, by name Shank, testified that he was, and for one year had been, assistant to the president of Ingersoll; that he had had experience over a period of ten or twelve years with the use in industry of Shear Clear milling cutters; that the first time he had anything to do with the use of a Shear Clear cutter was, in the fall of 1941, at the United States Naval plant at South Charleston, West Virginia, which was run by Carnegie-Illinois Steel Corporation, where he was assistant manager and, as such, was responsible for the specifications and approving all orders for machine tools, presses and all equipment in the plant; that heavy forged and rolled armor plate for the United States Navy was being processed at the ordnance plant in 1940 and 1941; that, as assistant manager of the Homestead plant of the Carnegie-Illinois Company, he had had previous experience with armor plate; that prior to 1940 there had been little milling done on heavy forged armor; that on opening the South Charleston plant heavy milling machines were put in; that the first milling operation set up on armour plate was cutting a rabbet or off-set on the armor where the turret rolled; that in setting that up with conventional cutters they were able to remove metal at a feed rate of about seven-eighths of an inch per minute; that in doing that they had much trouble with chips adhering to and clogging the blades and breaking them; that, when efforts were made to use higher feed rates with conventional cutters they broke up cutters about as fast as they could be made; that they experimented with an Ingersoll Shear Clear cutter and, after about the second plate it was used on, they jumped the feed rate from seven-eighths of an inch per minute to three inches per minute; that they were able to use in-

experienced operators on the machines because they did not clog; that in June 1942, the witness went to General Steel Castings in Madison and Granite City, Illinois, where he was assistant works manager and where they made cast hulls and turrets for the Army; that because of past experience Shear Clear cutters were ordered and used; that work pieces were of a spongy material and they had a delicate problem with chips but they were very proud of their record in getting out production and having very few machine and tool problems; that after two years (in 1944) the witness went across the street, where they had another plant—the Commonwealth Plant of the General Steel Castings—and where the witness was assistant works manager until 1947, when he became works manager; that, at the Commonwealth plant, since the war they machined steam locomotive beds, diesel trucks and diesel locomotives, passenger car trucks and miscellaneous castings, all in the class of heavy castings; that a steam locomotive bed would be on the machine about 120 to 140 hours; that Shear Clear cutters were used on the various products mentioned; and that a reduction of approximately thirty per cent in overall machining time was accomplished by using Shear Clear cutters, and consequently being able to step up feeds and take a heavier cut.

A witness, by name Smith, testified that he had been employed over thirty-two years by Studebaker Corporation; that the witness was, and for more than twenty years had been, tool supervisor for the automotive division of that corporation; that Shear Clear cutters of the Ingersoll Milling Machine Company are, and since the early part of 1941 have been, used in the Studebaker plant; that at the present time they have around 175 Shear Clear cutters in use; that Studebaker uses Shear Clear cutters on cylinder blocks, cylinder heads, bearing caps and different cast iron alloy parts; that prior to using Shear Clear cutters they used the regular conventional type cutters at feed rates of from 18 to 25 inches per minute, at production speeds of 60 to 70 surface feet per minute on high speed steels, 140 feet per minute on stellite and

on carboloy double that; that when they first adopted Shear Clear cutters they increased their feed rates to 40 to 45 inches a minute; that with presently available Shear Clear cutters they have gone up as high as 75 inches per minute; that with Shear Clear cutters their maintenance is much better than with the other kind, they get more pieces per grind, and they stay on the job longer; that with Shear Clear cutters the quality of the work is better than with conventional cutters,—they can get pretty near a ground finish with Shear Clear cutters; that with Shear Clear cutters they get out more cubic inches of metal per minute and yet do it in thinner chips.

A witness, by name Kaiser, testified that he is assistant chief engineer of plaintiff; that he has been employed by plaintiff since 1937, first as development engineer, working on research and experimental work, principally on cutters, then as head of the development and research department, then as chief engineer of the cutter division responsible for engineering, design and development in the cutter division, and finally as assistant chief engineer of the plaintiff and still responsible for cutter design and development; that during witness' employment he has had many opportunities of seeing milling cutters in use in customers' plants; that witness has observed the advantage to be derived from the use of Shear Clear cutters; that with Shear Clear cutters one is able to feed at increased rates, varying from one-hundred thirty to as much as three or four hundred per cent. and without sacrifice in cutter life; that in every instance one gets more metal removed per horse power with Shear Clear cutters than with conventional type cutters, that the finish produced is better, the accuracy is greater, and the maintenance cost is less with Shear Clear cutters than with conventional cutters. Kaiser further testified that there came a time somewhere around 1940 when Shear Clear cutters were sold for aluminum; that one of his best personal experiences had been at the Massena, New York, plant of the Aluminum Company; that Ingersoll had built machines for scalping aluminum ingots and had

placed conventional type cutters on them; that a lot of trouble developed, due to blades breaking and chips clogging; that witness applied Shear Clear cutters and was able to operate at 80% higher feed rate and to use the full amount of power that was available on the machine, which had been impossible before; that, as a result of this experience, it has been possible to build larger machines—the latest has 800 h. p. and uses a 91 inch diameter cutter and has a feed rate on aluminum up to 480 inches a minute, compared to 80 to 100 inches a minute with conventional cutters.

The testimony of these witnesses was not shaken on cross examination, neither was it contradicted at any time, and stands unchallenged.

The evidence shows that text writers have written of the Shear Clear cutter. Professor Boston, head of the Metal Processing Department at the University of Michigan, designates the Shear Clear as a type, and Mr. A. N. Goddard, founder of the Goddard & Goddard Company, in his work "Milling Cutters", sets forth the various types of cutters and designates the Shear Clear cutter as a distinct species of face mill.

On the record there can be but little doubt that the Kraus development involved invention unless his work was anticipated by plaintiff's "Type W" cutter. That question will now be considered.

In his opening statement on the trial, defendant's counsel said: "While we do not have any prior art patents that are material to the question of anticipation, we do have the plaintiff's own prior use * * * and we also have our own prior cutters." Considerable time was consumed on the trial in a consideration of plans of cutters produced by Goddard & Goddard Company, which cutters were claimed to anticipate, but, when the defendant's brief came in after the trial and before the final argument, it was silent with respect to cutters of Goddard & Goddard Company anticipating, and the final oral argument of defendant's counsel likewise omitted reference to claimed antici-

pation by cutters of Goddard & Goddard Company. Accordingly, the court assumes that that contention has been abandoned. That leaves plaintiff's "Type W" cutters as the only claimed anticipation.

The plaintiff met the issue with respect to the "Type W" cutter squarely and contended that no prior art cutter sought to be proved by defendant is made as directed by the Kraus patent or responds to any claim in issue.

Beginning at least as early as 1915 and continuing down to 1929, Ingersoll made and sold cutters which it designated as its "Type W". These Type W Cutters were intended and sold for use in face milling aluminum. There is some doubt on the record as to whether the Type W cutters, as actually made, matched in all particulars the drawings in evidence, but the court will assume, as did counsel for plaintiff, that the actual cutters did conform to the drawings.

These Type W cutters did not follow the Kraus teachings on angles.

The court will first examine Defendant's Exhibit 8 (Ingersoll Drw'g. No. 10985). That is the one that defendant selected to chart (Defendant's Ex. 29) and evidently considers its best example. That drawing shows a cutter with corners of the blades beveled at 45 degrees. It shows an apparent shear angle of 10 degrees. No rake angle is given on the drawing but the apparent rake angle measures out to be minus 5 degrees. Neither the effective rake or shear angles are given on the drawing. The witness Goddard computed them to be, respectively, $3\frac{1}{2}$ degrees and $10\frac{1}{2}$ degrees (both positive). Those values do not come within the specifications of the Kraus cutter for high speed steel blades operating on aluminum and having a 45 degree bevel. On the contrary, the handbook data shows that with high speed steel blades operating on aluminum the effective rake should be at least 15 degrees (instead of the $3\frac{1}{2}$ degrees the Type W actually had), and the effective shear should be at least 15 to 40 degrees (instead of the 10 degrees the Type W actually had). The Kraus cutter (Plaintiff's Ex. 4), on the other hand, hav-

ing been made as Kraus taught and in a manner that would provide the desired angles at the bevel cutting edge, had an effective rake of 20 degrees (i. e. meeting the specified value of at least 15 degrees), and an effective shear of 28 degrees (i. e. in the specified range of at least 15 to 40).

In the case of the Shear Clear cutter the procedure directed by the Kraus patent had been followed of (a) selecting effective angles from the tables to give efficient cutting with the blade and work material in question, (b) increasing the shear substantially even beyond that, and then (c) computing the apparent angles (with the aid of the Kraus charts in Figures 13 and 14 of the patent) that would yield such effective angles on a 45 degree bevel cutting edge. In the Type W cutter the procedure directed by the Kraus patent had not been followed and wholly different values are present. Not only is there a great disparity in the values of the angles, but the disparity in performance is just as great or greater. To prove that point, plaintiff built and had tested a cutter (Plaintiff's Ex. 60) from one of the old Type W drawings. Defendant's Exhibit 12 (Ingersoll Drw'g. 10871) was chosen for this purpose, but there does not appear to be any significant difference between Defendant's Exhibits 8 and 12. In Defendant's Exhibit 12 the effective rake angle was 3½ to 4 degrees and the effective shear was 10 degrees, comparing directly with 3½ and 10½ degrees noted above for Defendant's Exhibit 8. The witness Fishleigh testified as to the comparative tests run on the Type W cutter, Defendant's Exhibit 12, and a sample Kraus cutter, Plaintiff's Exhibit 4. The motion pictures of the test, Plaintiff's Ex. 62, still photographs Plaintiff's Ex. 63A, 63B, 63C, 63D, 64A, 64B, 64C, 65A, 65B and samples of the chips together with a photograph of them, Plaintiff's Ex. 66 and 67, are all in evidence. It was, the witness said "the most spectacular contrast of any of the tests that I ran on these face milling cutters." The Type W cutter even at 36 inches per minute feed gave "a mashed up chip, although they were for the most part separate, individual chips." At both 46 and 54 inches per

minute feed the Type W cutter gave "severe and bad clogging of the metal on the teeth, and the surface of the material was badly chewed up, scored." So bad was the Type W action at even 54 inches per minute feed that no further increase was possible. The Shear Clear cutter of Kraus gave a smooth even flow of spiral chips and smooth unscored surface not only up to 54 inches but on up to 102 inches per minute.

With such a disparity existing in point of fact, it is expectable that the Kraus claims would not read on the Type W cutter, and they do not.

Defendant's witness Goddard attempted to read Claim 10 on the Type W cutter with his chart Defendant's Ex. 29. But he did it by the expedient of ignoring one of the elements of the claim, viz., that the effective angles of the bevel cutting edge be of " * * * magnitudes suited for efficient cutting of predetermined metal." As has been pointed out, that is a requirement of angles of at least the handbook value (for high speed steel on aluminum in this instance). The Type W angles are not such angles.

Data on some twenty Type W cutters was tabulated in Plaintiff's Ex. 59A. Two features are found throughout the series. First, the apparent shear angle is always 10 degrees. Second, the blade is always located with its front or cutting face a blade width ahead of center. No matter what the cutter diameter, no matter what the bevel, those two characteristics appear. On the face of it, those look like constants. It is reasonable to infer that the makers regarded them as such. But, as a matter of fact, they were not constants. In light of Kraus' discovery, the true rake and shear angles at the bevel cutting edge can be calculated and when that is done it is found that the true or effective rake angles varied from minus 3 degrees and 46 minutes to plus 12½ degrees, and the true or effective shear angle varied from 2 to 11½ degrees. So, what the makers of the old Type W cutters were doing was keeping the wrong things constant. In so doing, they apparently unwittingly made wide variations in the actual effective angles, but

they never came close to what Kraus, years later, discovered they should have had.

The court is satisfied that the Type W cutters do not anticipate.

The question as to whether or not the patent in suit is invalid because it does not comply with Section 33, Title 35 U.S.Code will now be considered. That statute requires that an inventor must describe

"* * * the same (his invention), and * * * the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; * * *."

And, further, the description must:

"* * * in case of a machine, * * explain the principle thereof, and the best mode in which he has contemplated applying that principle, so as to distinguish it from other inventions; * * *."

On the subject of claims, the statute goes on to provide that the inventor:

"* * * shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery."

█ It is familiar law that the description of the invention is addressed to those skilled in the art, that its clarity to them, rather than to laymen, is the test. It need not repeat what to them is familiar data or prior knowledge in their field. On the other hand, the description cannot merely point out an area for further experiment, remitting the reader to the necessity of proceeding by trial and error to make his own discovery of how to practice the invention.

The plaintiff contends that the claims in suit, numbers 1, 2, 10, 12, 15, 16 and 19, when read in the language of those skilled in the art, each specifies clear numerical values for the blade angles.

For purposes of present analysis the claims may be placed in two groups. Claims 10, 12, 15, 16 and 19 in Group I, claim 10 being typical, and claims 1 and 2 in Group II, claim 1 being typical.

In so far as the present inquiry is concerned, the important part of claim 10 is:

"* * * the cutting faces of said blades being positioned at an apparent rake angle of negative sign and at a shear angle both related with each other and correlated in magnitude to the amount of said bevel angle so that the rake and sheer angles effective on said main edges during operation of the cutter are of positive sign *and magnitudes suited for efficient cutting of predetermined metal.*"

The plaintiff admits that if "suited for efficient cutting of predetermined metal" be taken as nothing more than a pious platitude that what is wanted is a good cutter, it would be compelled to concede that the claim had failed under that statute. In the jargon of the patent law, it would be "functional." But that is not what the italicized words refer to. They refer to the known values (magnitudes) of effective angles (rake and shear) set out in the familiar data tables of the art for each variety of blade and work material. The specification makes that plain. So does the testimony. The specification says (p. 4, col. 1, lines 1–7):

"In constructing a cutter in accordance with the present invention, the correct positions of blades are determined by *first selecting* the proper *effective* rake and shear angles which are of course *controlled by the cutting material* * * * *and the work material* * * *."

At page 2, column 2, lines 28–30, the patent again directs:

"* * * effective shear and rake angles proper for the work material with which the cutter is to be used."

And all of this follows the observation at page 2, column 1, lines 7–9, in reference to conventional cutters, that:

"* * * rake and shear angles *r* and *s known* to be *most effective* for cutting the metal on which the cutter is to operate."

The testimony establishes that there is, and was long before Kraus, regular, tabular data available in handbooks and elsewhere which gave the precise numerical data for various materials. Thus, the witness Kaiser at Tr. 760 said:

"* * * Assuming for the moment that you have a teaching, for example, in the Kraus patent that when you put that bevel on there, you do alter what were before the effective rake and shear angles, and that they can be controlled by a further change in the posture of the blade, if you have got that data before you, then was it possible to go to handbooks or textbooks, regular tabular data available to engineers, at a time before Kraus came along, and find there the data that you would need to choose a proper effective or actual rake and shear angle for any edge? A. Yes.

"Q. And would that tabular data give different values, depending on what the cutter material was and what the work material was? A. Yes, it would."

So, when claim 10 specifies "magnitudes" of angles for "efficient" cutting of "predetermined metal," it is referring to precise numerical values,—so many degrees rake and so many degrees of shear for 1020 steel, so many of each for 4140 steel, so many of each for aluminum, etc., etc. Kraus did not discover or tabulate that data. That was old. Everyone skilled in the art had it. What Kraus did was to discover that the effective angles on bevel cutting edges were not the apparent angles, were not the angles specified in the tables, but were something quite different. And what he taught was how to overcome that deficiency, how to adjust the apparent angles so that the true, the effective angles actually working at the bevel would be what the tables said they should be. In so doing he produced a face mill that outperformed all others.

Claim 12, the second one in Group I, makes the point even clearer, saying as it does that the effective angles have "* *

sufficient magnitude to suit the known cutting characteristics of said metal, * *."

The other claims of Group I (i. e., claims 15, 16 and 19) all use language like that of claim 10 in this respect, referring to the angles of a size required for "efficient" cutting of the particular material. They refer directly back to the known, tabular data.

Once it is appreciated that the reference is, in fact, to such precise data, available to all in the cutter field, the whole argument about "lack of limits" falls.

The claims in Group II (i. e., claims 1 and 2) go to what the specification refers to as "another aspect" of the invention. Thus, at page 2, column 2, lines 44–50, it is said:

"*In another aspect* the invention also contemplates increasing the magnitudes of the shear and negative rake angles to such an extent that the effective shear angle is *substantially greater* than that *required for efficient cutting* but such as to control the end thrust on the cutter and the *direction of chip flow*."

There Kraus tells us that, in that "aspect" of his invention he prefers to select a value for the real or effective shear angle greater than the one given in the tables for any particular metal. To have left it simply at "substantially greater" could again have opened him to a charge of lack of specificity. But he did not leave it there. He had pointed out that the familiar shear angle was ten degrees for a high speed steel blade operating on steel or cast iron (p. 2, col. 2, lines 33–38) and he gives as an example of his substantial increase, an increase to 24 degrees of shear for those materials (p. 2, col. 2, lines 59–67). Nor does he leave it with that. For in claims 1 and 2 he further characterizes the increase, not merely as "substantial," but in terms of a definite order of magnitude, saying it is "more than fifteen degrees." The charge of indefiniteness in the claims is not supportable.

Defendant's attack on the sufficiency of disclosure appears to be premised on the same contentions that it has leveled against

the claims. The contention fails for the same reason.

Once it is appreciated that "known values" of effective angles for "efficient" milling of "particular materials" refers, in so far as the cutter man is concerned, to definite tabular data, then no argument remains to defendant. True, that tabular data has been revised from time to time, both before and since Kraus, new materials have been added, but that makes it no less precise. The claims are still drawn in what amounts to actual numerical terms. Moreover, the testimony of both witnesses Fishleigh and Kaiser is that in their opinion a man skilled in the cutter art can successfully follow the teachings of the patent. No witness testified in contradiction.

The charge of indefiniteness in the disclosure is not supportable.

Reference, which it is hoped may be brief, will be made to the question of infringement. The court has just completed reading again the transcript of the final oral argument of counsel for defendant, and cannot find therein reference to that question. This is no reflection on counsel. The question, if it was in the case, was certainly not a major one.

Plaintiff's charge of infringement is based on the defendant's use of certain so-called Free Clear cutters purchased by defendant from Goddard & Goddard. Of the several cutters so purchased and which are claimed to be infringements, plaintiff elected, for purposes of the interlocutory hearing, to stand on two of them as exemplary. The purchase, use and details of structure of the accused cutters are established by the answers to plaintiff's interrogatories. The illustrations of the accused cutters in Plaintiff's Ex. 50 to 55 have not been challenged and may, therefore, be taken as fairly depicting them. A cutter was prepared by plaintiff (Plaintiff's Ex. 37) having the precise effective angles of one of the accused cutters but of a size such that it could be run in direct comparison with one of the Kraus cutters that was on hand. Such direct comparison tests were made, motion pictures (Plaintiff's Ex. 45), still photographs (Plaintiff's Ex. 47) and samples of the chips (Plaintiff's Ex. 48) were produced on the trial. Such proofs were not challenged or contradicted by defendant. They show a complete identity of operation and results.

Plaintiff's expert witness Fishleigh applied the individual elements of the claims to the accused cutters. He has indicated by his testimony on the point and the notes on his charts (Plaintiff's Ex. 50 to 55) that he found a response to each element in the accused cutters. Defendant rested its case without offering any testimony in contradiction. Defendant did cross-examine Mr. Fishleigh as to his charts on claims 1 and 2 and defendant denies that these two claims are infringed, but, as to the remainder, they take issue only on validity and not on infringement. Claims 10, 12, 15, 16 and 19 clearly are infringed.

Claims 1 and 2 present a special problem as to infringement. Both of them call for an effective shear angle "of more than fifteen degrees." The effective shear angles on the accused cutters are not quite that large. In one cutter it is 14 degrees. In the other it is $12\frac{1}{2}$ degrees. Defendant has come that close to the literal terms of the claims. Has it infringed those claims? The Supreme Court has recently pointed out that a court is not powerless in such circumstances, Graver Tank & Mfg. Co. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 858, 94 L.Ed. 1097. In that case, the court found infringement of claims calling *inter alia* for "alkaline earth metal silicate" where the accused substance was "manganese silicate," that is, a silicate of a metal which was not an "alkaline earth." It did so by application of the doctrine of equivalents. Mr. Justice Jackson, speaking for the court, said of the doctrine and the general circumstances of its applicability:

"But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. * * *

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent."

Further, on the subject of procedure to be followed in ascertaining whether or not devices are equivalents, the court said:

"What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

"A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence." 339 U.S. at pages 609–610, 70 S.Ct. at pages 856–857.

In this case, the witness Fishleigh's testimony established that the accused cutters and that of the patent are similar devices, that they function in precisely the same manner, and produce identical results. The results of his tests to establish those points are in evidence in form of motion pictures (Plaintiff's Ex. 45), still photographs (Plaintiff's Ex. 47), chip samples (Plaintiff's Ex. 48) and detailed testimony relative to them. No countervailing evidence whatever has been proffered by defendant. Moreover, Mr. Fishleigh showed the court how it was that defendant was able to shade the angle just short of the 15 degrees of the claims. As he explained, the increased use and experience with tungsten carbide tipped blades since the issuance of the Kraus patent has been accompanied by a diminution (blunting) of the angles found most efficient for blades of that material. The advent of such a cutting material which permits use of blunter angles should not permit a defendant to escape on such a fine shading of angles, especially where, as here, the 15 degree value was intended to and does represent an order of magnitude for the "substantially increased" shear that Kraus found preferable.

The court is of the opinion that Claims 1 and 2 are infringed.

■ The defendant contends that the patent is unenforceable because of unclean hands. Of this defense, the defendant in its final brief says: "This defense is based upon the fact that although Kraus and the plaintiff had actual knowledge of plaintiff's own prior 'W' type beveled edge cutter, yet claims were obtained in the patent in suit, that were broad enough to read on the old 'W' type beveled edge cutter. The 'W' type beveled edge cutter was not cited by the patent office as a reference."

The court has considered the Type "W" cutter at length in its study of the question of anticipation. The record shows that the last cutter of that kind was sold by the plaintiff in 1929, nine years before the application for the patent in suit was filed. The last sale of replacement blades for such a cutter was made in 1951. As has been seen, the cutting action and the performance capabilities of this Type "W" cutter differed substantially from those of the Kraus cutter. Drawings of the Type "W" cutter were found in the files of plaintiff in 1945, as the result of a search for prior art. Nowhere in the record, however, is there any evidence that anyone connected with plaintiff had sufficient knowledge of the Type "W" cutter to believe that it was related to the patent in suit until the matter

was brought up for review in 1945. Kaiser, assistant chief engineer of plaintiff, and since 1941 in charge of handling plaintiff's negotiations with its patent attorneys, should have known, if anyone did, of the relationship of the Type "W" cutter. Yet, he testified that until August, 1945, he "had heard of the Type W, but it didn't mean anything" to him. He "had never made any check of it or had never knowingly seen one." It was only after plaintiff's president ordered Kaiser to "bend over backward to find anything that might have any possible bearing on this patent" that the Type "W" drawings were found and compared with the Kraus cutter. Plaintiff's president Gaylord testified that in 1945 he or his associates "discovered" the drawings of the Type "W" cutter. Defendant did not attempt to contradict the fact of this "discovery," or prove knowledge or appreciation of the drawings before that time. The patentee also was on the witness stand and testified. On cross-examination he testified that he had "turned up" drawings of the Type "W" cutter along with many others in the course of his work. But at no time did defendant question Kraus on the truth of the statements made in his oath (contained in Defendant's Ex. 1) for application for the patent in suit. It is in that oath that Kraus swore he believed himself to be the original and first inventor of the subject matter of the application. The truth of that oath is not contradicted. These three witnesses were the men who would have had knowledge and appreciation of the Type "W" cutter. Kaiser, when questioned on the subject, definitely denied any appreciation of the structure or nature of the Type "W" cutter. Gaylord and Kraus were available for questioning on this point. Defendant did not question them. There is no evidence contradicting the testimony of Kaiser that he did not know, of Gaylord that the drawings were "discovered" in 1945, or the oath of Kraus that he believed' himself the original and true inventor.

The charge of fraud in deliberately withholding information from the Patent Office for the purpose of obtaining invalid patent claims find no support in the record.

The defendant bases a second defense on the charge of alleged fraud in obtaining the patent in suit. The defendant charges that plaintiff was not entitled to the benefit of the disclaimer statute, Section 65, Title 35 U.S.C., R.S.4917, because "these claims that are invalid were not obtained by accident, inadvertence or mistake, but were deliberately obtained in view of their own prior art."

■■ Whether "accident, inadvertence or mistake" is present is a question of fact. Van Meter v. U. S., 2 Cir., 1931, 47 F.2d 192, 194. The evidence which defendant urges on this issue is the same as that heretofore considered on the question of unclean hands. A mistake of fact as to the novelty of the claimed subject matter is a mistake within the terms of the disclaimer statute. Walker on Patents, Vol. II, p. 1290 (Deller's Ed., 1937). Such was the mistake here. Not only the testimony of the witnesses heretofore reviewed but the attitude of plaintiff toward the patent belies the defendant's assertion. As soon as the drawings of the Type "W" cutter were uncovered, defendant was notified (Defendant's Ex. 6). Plaintiff did not attempt to hide or secrete its drawings. The instructions to witness Kaiser to "bend over backward" to find prior art is persuasive evidence of plaintiff's good faith. So, too, was plaintiff's conduct of the negotiations with defendant. Plaintiff wrote to defendant that it did not want to try to support a patent that was questionable. Furthermore, it asked defendant if it had any further prior art which would relate to the patent (Defendant's Ex. 7). The entire course of plaintiff's acts in connection with the patent is contrary to the charges of defendant. It was not the conduct of one attempting to circumvent the law.

■ There was no fraud in the procuring of the patent and no reason why the plaintiff should not have the benefit of the disclaimer statute.

■ The defendant contends that the plaintiff unreasonably delayed the filing of its disclaimer and that as a consequence of such delay the entire patent is invalid. The

facts follow. On July 2, 1945, Goddard Company wrote the plaintiff concerning the patent in suit. On July 26 or 27, 1945, Lewis Goddard and his brother visited Mr. Gaylord, president of Ingersoll, and certain drawings of Goddard Company's prior cutters, asserted to anticipate the patent claims, were given to plaintiff. On July 3, 1945 Mr. Gaylord wrote Mr. E. A. Goddard, vice-president and general manager of Goddard Company, "We have gone over the drawings in a preliminary way but want to talk to our attorneys before writing you definitely. He will return in the next week and because I am to be away I have asked Karl Kaiser to write you." On August 10, 1945, Karl Kaiser wrote Mr. E. A. Goddard of Goddard Company, and in the first paragraph referred to one of the drawings theretofore submitted by Goddard Company. The second paragraph of that letter reads:

"However, as Mr. Gaylord told you, we have discovered other prior art which will invalidate several claims of our patent. In view of this other prior art we have instructed our attorneys to proceed with the withdrawal of those claims which appear to be invalid."

An opinion was rendered by patent counsel on October 23, 1945. On November 12, 1945, Kaiser again wrote Goddard "We are filing a disclaimer on Claims Nos. 3, 6, 7, 8 and 9 of Patent No. 2,186,417." On November 30, 1945, a disclaimer having been prepared, was executed by Gaylord. On December 7, 1945, the disclaimer was received and filed in the Patent Office.

Defendant's counsel asserts that plaintiff delayed for 119 days (August 10, 1945 to December 7, 1945) before filing the disclaimer. The court does not so read the record. Without entering upon an examination of the question as to whether or not the alleged admissions were conclusions of fact or conclusions of law, the court is clearly of the opinion that the oral statement, said to have been made by Gaylord, and the written statement by Mr. Kaiser in his letter of August 10, 1945, were, at the best, informal admissions of exceedingly complicated conclusions of fact by laymen and should be held to have no greater effect as admissions than informal admissions by laymen of conclusions of law. Mr. Gaylord, in his letter of July 30, 1945, had indicated that the plaintiff desired to take the opinion of counsel, as it certainly had a right to do. The court concludes that there was no unreasonable delay and that there was no procrastination. The finding of the art, the study by plaintiff, the request for opinion of counsel, the executing and filing of the disclaimer were steps in one continuous undertaking. Each followed in rapid succession.

As has been indicated, the opinion of counsel as to whether or not claims should be withdrawn, the course to be followed, was rendered October 23, 1945. The form of disclaimer was prepared by counsel as appears on its face (Defendant's Ex. 1). According to Mr. Kaiser's letter of November 12, 1945, the decision had been made as to the particular claims in the patent to be disclaimed. Within the very month of that letter, the disclaimer was executed and filed in the Patent Office. Plaintiff did all it could and with dispatch to limit its claim to the invention of Kraus. Plaintiff did not wait, as the courts have indicated a patentee may, until adjudication where there is "a reasonable ground for difference of opinion as to whether the prior use, brought home to the knowledge of the patentee or his assignee, really negatives the novelty of anything claimed by him." Plaintiff undertook the burden of having counsel review the patent claims, and promptly, upon determination of the course to be followed, filed the disclaimer. The action taken by the patentee, rather than being reason for condemnation, is basis for commendation. There was no attempt to conceal from anyone, even from this defendant, what plaintiff intended to do.

The court holds that there was no unreasonable delay in the filing of the disclaimer.

Finally,[1] the defendant contends that the patent is invalid because the plaintiff failed to disclaim claim 13, which claim, defendant says, is indistinguishable from claim 3 which was disclaimed. The two claims are as follows:

| Disclaimed Claim 3 | Claim 13 |
|---|---|

A milling cutter for removing a layer of metal from a work piece to form a smooth surface thereon by relative feeding movement between the rotating cutter and the work piece parallel to said surface, said cutting having

A cutter for removing a layer of metal from a work piece to form a smooth finished surface thereon by relative feeding movement between the rotating cutter and the work piece parallel to said surface, said cutter comprising

**Disclaimed Claim 3**

1. A rotary body

2. A plurality of teeth projecting therefrom and having substantially straight cutting edges defining a generally frusto-conical main cutting face

3. Each tooth being disposed
 (a) with its leading face ahead of a radius of the cutter extending parallel to the plane of such face whereby to produce a negative apparent rake angle

 (b)

 (c) but a positive rake angle effective on said cutting edges, and

4. Second cutting edges on said teeth acting during operation of the cutter to smooth off the zone of the work machined by said main face.

**Claim 13**

1. A rotary body, and

2. Teeth thereon having main cutting edges disposed at a bevel angle to the finished work surface, and

3. Cutting faces positioned
 (a) at an apparent rake angle of negative sign

 (b) and at a shear angle coacting with each other and with the bevel angle

 (c) to define a rake angle of positive sign effective on the bevel edge during operation of the cutter, and

4. Finishing cutting edges on said teeth acting during operation of the cutter to smooth off the zone of the work machined by said main edges.

Goddard, defendant's expert, testified at some length on the elements of the two claims. He assumed in his testimony that result follows cause as set out in Claim 3. Specifically, he assumed that if the blade face is located as specified that therefore not only would the apparent rake angle be negative (which it will) but also that the effective rake angle will be positive. Here he erred. It will not necessarily be so. Goddard admitted that "in order to have 'a positive rake angle effective on said cutting edges'" one "must have a positive shear angle in order to do that." As appears above, Claim 3 is silent on "shear" angle. It may or may not produce the result the claim specifies and is therefore too broad. Claim 13, in contrast, identifies *all three* of the factors that have to coact to produce an effective rake angle of desired positive sign, viz., the "rake," the "shear" and the "bevel" angles. Claim 3 is thus seen to cover too much. Claim 13, in contrast, is precise. Clearly, the two claims are definitely and patentably distinguished the one from the other.

The court is of the opinion that the patent is valid.

The court is filing formal findings of fact and conclusions of law.

The court thanks counsel on each side for their careful and thorough preparation, for their expeditious presentation of the evidence, and for their briefs and arguments, which have aided the court greatly.

Findings of Fact and Conclusions of Law.

### Findings of Fact

1. This Court' has jurisdiction of the parties and of the subject-matter. The patent in suit, No. 2,186,417, is, and has been since its issuance, owned by plaintiff.

2. The patent in suit relates to a milling cutter intended for use in accomplishing face milling. In that operation a layer of metal is removed from the work by a cutter passing over the work and revolving about an axis at right angles to the surface being fashioned. Milling cutters were in use many decades before the patent in suit and face milling cutters constituted one of several conventional classes of such cutters.

3. It was customary in conventional face milling cutters prior to Kraus to cant or position the cutter blades so as to impart particular degrees of rake and of shear to the peripheral edge of the blade. That edge constituted the main or primary cutting edge. Tabular data was available giving the combinations of angles (rake and shear) for most efficient cutting with all common combinations of blade material and work material.

4. Conventional face milling cutters prior to Kraus were also frequently provided with a bevel edge at the lower corner of each blade. That protected the blades against burning and shock damage at such point, prolonging the life of the cutter.

5. Kraus was the first to discover that when a bevel was introduced at the corner of a conventional blade (and as had been done for more than 20 years in many cutters) the rake and shear angles actually effective on the bevel were wholly different from the so-called "apparent angles," that is, the angles of rake and shear given to the outer edge of the blade by suitable posturing of it.

6. The solution of the problem of providing effective angles on the bevel cutting edge, suited for efficient cutting, required more than the ordinary skill of a cutter designer even after the blind spot of the prior art had been exposed.

7. By making the bevel cutting edge the main cutting edge Kraus was able to, and did, gain advantages in operation that were not possible with other cutting edges on a cutter blade. He was able to employ higher "effective" shear angles, with consequent better chip disposal, than could be tolerated for a peripheral cutting edge of a conventional cutter.

8. In actual commercial use the Kraus cutter has replaced predecessor conventional face milling cutters in many instances. It has accomplished increased feed rates of 30 to several hundred percent, has materially reduced production costs, and has materially increased the quality of the products milled. Its success was such as to arouse the envy of Goddard & Goddard, suppliers of the accused cutters, and cause them to bring out a line of cutters simulating it, after an unsuccessful effort to bludgeon the plaintiff into granting a substantially free license.

9. The cutter of the Kraus patent constituted a distinct new type of face mill with operating characteristics markedly superior to those of its predecessors. It has been generally recognized as an important advance by those eminent in the metal cutting field. Kraus made a contribution that was considerably beyond the capabilities of a routine investigator or designer in the metal cutting field.

10. In light of the general state of development of the cutter field, and of the facts set forth in the preceding findings, it is clear that it required invention of the quality required by U.S.C. Title 35, Sec. 31, to produce the Shear Clear cutter of the Kraus patent.

11. The references in the claims and in the specification to effective rake and shear angles for efficient or effective cutting of predetermined materials are, in the parlance of cutter designers, references to tabular data on precise sizes of angles best suited for each material and available to workers in this field long before Kraus. The description of the Kraus patent is sufficiently definite for one skilled in the cutter art to produce a cutter embodying the invention, and for use on any particular selected material, without experimentation. The claims describe the invention with sufficient definiteness to enable one skilled

in the art to ascertain readily whether or not a particular cutter does or does not come within the claim and what feature or features must be omitted to avoid infringement.

12. The Ingersoll Type W cutters did not have effective rake and shear angles for a bevel cutting edge of magnitudes specified by the tabular data of the art for efficient cutting of aluminum (the material they were intended to operate upon) by high speed steel blades (the blade material they used). Insofar as they were able to do any cutting at the bevel edge, it was slow and produced poor chip flow. The Type W cutters did not operate in the same manner as the Kraus cutter and are incapable of producing the same results. The Type W cutter does not anticipate any claim in issue.

13. The various examples of Type W cutter drawings evidence no awareness of the true rake and shear angles actually effective at the bevel cutting edge. It appears that the great variety of such angles appearing in the Type W cutters resulted from ignorance of them. With all the variation, however, they did not approach the values required for efficient and effective operation.

14. The three Goddard & Goddard drawings (Def.Ex. 38, 39 and 40) purport to show special cutters suited for form cutting. They do not embody effective rake and shear angles of the magnitudes taught and claimed by Kraus. They are incapable of doing the work of the face milling cutters disclosed by Kraus. They do not anticipate any claim in issue.

15. The actual structure embodied in each of the three Goddard & Goddard cutters alleged to be exemplified in Def.Ex. 38, 39 and 40 is not established with the certainty required to show prior knowledge or use.

16. Plaintiff has shown that each mechanical element of each of claims 10, 12, 15, 16 and 19 finds a full response in two exemplary accused cutters used by defendant. The construction of those cutters is fairly and accurately depicted in Pl.Ex.

50 to 55, and their operation is correctly represented in the motion picture Pl.Ex. 45 and still photos Pl.Ex. 47. Defendant has by its failure to contradict such proofs in any respect conceded that claims 10, 12, 15, 16 and 19 are, if valid, infringed.

17. The accused cutters find literal response in claims 1 and 2 except that their effective shear angles are respectively 14 and 12½ degrees rather than the "more than 15 degrees" of those two claims. The accused cutters are substantially similar to the cutter of the patent, they operate in substantially the same manner, and produce substantially identical results. The accused cutters are the equivalent of cutter of the patent as defined in claims 1 and 2.

18. Claims 1, 2, 10, 12, 15, 16 and 19 have each been infringed by defendant's use of the accused cutters.

19. The Type W cutter is an old cutter made by plaintiff until 1929. Drawings of this cutter were unearthed from plaintiff's files in August, 1945, when they were discovered as a result of a search for prior art bearing on the patent in suit. Prior to that time, no one concerned with the patent understood the Type W cutter to be relevant to the patent. There was no deliberate or conscious withholding of information from the Patent Office during the prosecution of the application for patent nor intent to secure invalid claims.

20. The patentee and plaintiff-assignee were unaware at the time the patent in suit issued that certain claims of the patent were too broad. Therein lies the mistake allowing the plaintiff to make a disclaimer. The mistake was not found until after the patent issued.

21. Certain drawings of prior art cutters, came to the attention of plaintiff in July and August of 1945. In the latter month, patent counsel were instructed by plaintiff to render an opinion on validity of the patent claims and any need for disclaimer. On October 23, 1945, an opinion was rendered by counsel, and by November 12, 1945, it had been decided that claims 3, 6, 7, 8, and 9 were to be disclaimed. The disclaimer was executed November 30, 1945,

and filed in the Patent Office December 7, 1945. There was no unreasonable neglect or delay in filing the disclaimer.

22. The claims retained in the patent are definitely and patentably distinguished from those disclaimed.

## Conclusions of Law

### I

 Unusual difficulties in ascertaining the cause of deficiencies in prior art devices, failure over many years of those working in the field to perceive the causal connection between the thing to be remedied and the faults it induces, are to be taken into account in determining the presence or absence of patentable invention, just as are difficulties in affording the remedy once the problem is known.

### II

 The practical importance and success in the practical art of the patented device, the degree to which it has displaced predecessors, and advantages accruing from its use, are to be taken into account in determining the presence or absence of patentable invention.

### III

The statute, R.S. 4888, made it requisite that Kraus describe his invention and its practice in such terms that anyone skilled in the cutter art, and having knowledge of the practices and data available in that art, could produce good, efficient cutters embodying the Kraus invention and without being remitted to the necessity of further experiment and discovery.

### IV

 The claims of the patent measure the grant. They must, in this instance, define the Kraus cutter with sufficient certainty that one skilled in the art can determine whether or not any particular proposed cutter does or does not fall within their metes and bounds, as well as what feature or features must be omitted if the claims are not to be infringed.

### V

 An alleged instance of prior knowledge or use to defeat an issued patent must be established by proof beyond a reasonable doubt.

### VI

 Even though the literal term of a claim be avoided, infringement is not necessarily precluded by such avoidance, particularly where a rigid literal reading of the claim will enable a copyist to make unimportant and insubstantial changes while retaining the real substance of the invention. The true test is whether or not the two devices are substantially similar, and operate in substantially the same way to produce substantially the same result. If so, the two are equivalent and infringement is made out.

### VII

 A patent owner is entitled to the benefit of the disclaimer statute, 35 U.S.C. § 65, R.S. 4917 when, upon learning of the possibility that at least some of its claims are too broad, he promptly seeks advice of counsel, and having procured it moves promptly thereafter to execute and have filed the disclaimer prepared by counsel.

### VIII

 A patentee who voluntarily makes disclaimer of a claim prior to any adjudication of his patent is free to retain any other claims in his patent which are definitely distinguishable from the claim or claims disclaimed.

### IX

An injunction should issue forbidding further infringement by defendant of each of claims 1, 2, 10, 12, 15, 16 and 19 of U.S. patent No. 2,186,417.