AUSTENAL LABORATORIES, INCORPORATED, Plaintiff,

v.

NOBILIUM PROCESSING COMPANY OF CHICAGO, Nobilium Products, Inc., and Alloys and Plastics, Inc., Defendants,

Julius Aderer, Inc., Intervener-Defendant.

No. 53 C 1316.

United States District Court
N. D. Illinois, E. D.
June 5, 1957.

Brown, Jackson, Boettcher & Dienner, Chicago, Ill., for plaintiff.

Alvin E. Stein, Chicago, Ill., Howard J. Churchill, Churchill, Rich, Weymouth & Engel, New York City, for defendants.

CAMPBELL, District Judge.

This is an action alleging infringement of patent No. 2,461,416, entitled "Pattern Material, Pattern and Method", granted

February 8, 1949, to Reiner W. Erdle and Charles H. Schaar. Plaintiff, Austenal Laboratories, Inc., acquired the patent by assignment from Erdle and Schaar.

The patent in suit relates to a ready-made casting pattern for use in casting metal dentures and other articles as a substitute for the wax patterns which had previously been used for that purpose. Of the nineteen claims recited in the patent, plaintiff relies on fifteen (that is, claims 1–3, 6–10 and 13–19). Claims 1–3, 6–10 and 15 of those relied upon specify that the patterns shall be used in dental casting operations while the remaining six claims are not so limited to the dental field and thus are drawn to cover casting operations outside the dental field.

Plaintiff, Austenal Laboratories Inc., is engaged in the business of manufacturing a chrome-cobalt alloy which it sells to its various franchised or licensed laboratories which in turn use this product in making metal dentures. Plaintiff sells this product under the trade mark "Vitallium". Plaintiff also sells ready-made dental casting patterns which are alleged to embody the invention of the patent in suit. Plaintiff sells these patterns under the trade mark "Flexseal".

Defendants, Nobilium Processing Company of Chicago, Nobilium Products, Inc., and Alloys and Plastics, Inc. are engaged in the business of selling a chrome-cobalt alloy under the trade mark "Nobilium". These alloys are also used in the production of metal dentures. The Nobilium companies also sell ready-made dental casting patterns under the trade mark "Nobilforms". These patterns are alleged to be infringements of the patent in suit.

The intervener-defendant, Julius Aderer, Inc., is engaged in the business of selling gold and precious metal alloys for use in making metal dentures. Aderer sells its ready-made dental casting patterns under the trade mark "Cast Forms". Plaintiff charges that these patterns infringe the Erdle and Schaar patent. (The Aderer Company will be treated in this memorandum as though it belongs in the same group which comprises the Nobilium companies.)

Historical Background

Before any study of the subject matter can be attempted, a discussion of the pertinent background material seems most appropriate. The preparation of a metal denture requires several steps. First, the attending dentist takes an impression of the patient's mouth. This impression actually amounts to a negative of the mouth since the gums and teeth show as cavities rather than as a reflection of their natural shape and form. From this impression, a master model in plaster is prepared which, in effect, constitutes a positive or true picture of the patient's gums and teeth.

The master model is then used for the purpose of preparing a refractory model which is able to withstand the high temperatures required for dental casting purposes. The refractory model is also a positive of the patient's gums and teeth and, depending on the skill of the technician, represents, as nearly as possible, an exact reproduction of the gum and tooth structure of the patient.

Prior to the invention of the patent in suit, the next step was to coat the refractory model with a substance called "model dip". This process served the dual purpose of providing a "tacky" surface and preventing the refractory material from powdering or flaking off.

The next step was to sketch, in pencil, an outline of the refractory model. This outline defined the areas to be included in the metal denture and determined its general cross-section and shape. The sketch would consist of various dental sections including clasps (which grip around a retaining tooth), palatal bars (which extend across the palate of the patient), lingual bars (which are used on a lower denture around the inside of the teeth), and retention areas (which serve as an anchoring or fastening means for the teeth which are to be supplied to the denture).

After the refractory model had been sketched, it was then customary to form

a wax pattern of the metal denture by dripping hot wax (using a hot spatula) onto the refractory model and within the confines of the pencil markings of the sketch. This technique was called "hand waxing". The technician would drip as much hot wax onto the refractory model as was necessary to suitably form the cross-section and shape of the clasps, palatal bar, lingual bar and the retention areas.

The next step was to connect this wax pattern to a so-called casting flask so that when the wax was subsequently eliminated, continuous paths were thus provided through which the metal would flow into the cavities so provided by the elimination of the wax pattern. After the model had been suitably sprued, it would then be placed into a casting flask which would be filled with a so-called "investment material".

Next, this flask assembly would be placed into a furnace which would be raised to a temperature sufficiently capable of causing the wax of the casting pattern and of the sprues to be completely eliminated from the mold; otherwise, imperfect castings would result since the metal could not flow into the spaces which remained occupied by the residue left on the mold.

Following this step, the refractory mold was then placed on a centrifugal casting machine and molten metal under centrifugal force would be permitted to enter all the empty spaces left by the elimination of the wax pattern. Thus, when this molten metal became solidified, and was removed from the mold, it would then become the cast metal denture.

Finally, the sprues and burrs were removed and the metal denture would be polished and tested to determine whether the denture conformed to the particular requirements of the patient. Teeth would then be added to the denture and the process would be completed.

The process herein described was in use for several years and was commonly known in the field as the "lost wax process".

As time progressed, it became apparent that there were several sections of a metal denture which were common to many dentures. Among these were certain types of wires which were capable of being used for forming retention areas, parts of clasps, and lingual bars. Thus, hand extrusion devices began to be used by the laboratory technician in preparing ready-made wax dental casting forms which generally had the desired cross-sectional dimension and shape of that part of the denture for which they were intended.

In later years, the Kerr Manufacturing Company of Detroit, Michigan, placed on the market various types of ready-made wax sections which the laboratory technician could use to form clasps, lingual bars, retention areas, etc. This served to eliminate complete hand waxing.

In 1942 the J. M. Ney Company of Hartford, Connecticut, introduced the "Ney Waxing Die Plate" and its companion book of instructions, "The Ney Partial Denture Book". Suffice it to say, at this point, that the Ney Company disclosed and taught a technique of providing ready-made dental casting patterns for application to dental models. It was disclosed that these ready-made dental castings corresponded generally to the cross-sectional dimensions and shape of the article to be cast.

Finally, the Erdle and Schaar patent, the patent in suit, was applied for on December 2, 1944 and the patent was granted by the United States Patent Office on February 8, 1949. The effect of this patent in the ready-made dental casting field will be discussed hereinafter in this memorandum.

### The Patent in Suit

At the trial, claims 1, 2, 8, 9 and 19 were considered as examples of the patent in suit. It might be helpful, therefore, to set forth these claims herein.

For all practical purposes, claims 1 and 2 can be treated as being identical except that while claim 2 concerns itself with a ready-made denture clasp casting pat-

tern, claim 1 merely refers to a ready-made casting pattern. (The same observation can be made as to claim 3 except that it pertains to a ready-made denture palatal bar casting pattern.) In claims 1 and 2 it is provided, in identical language, that the pertinent pattern shall be of:

"* * * cross-sectional dimensions and shape corresponding generally to the cross-sectional dimensions and shape of the article to be cast and composed essentially of thermoplastic material having a surface which is non-setting, pressure-sensitive adhesive, said thermoplastic material being eliminatable by heat from refractory molds, and said pattern having sufficient elastic recovery from distortion with respect to cross-sectional dimension and shape so as not to become permanently distorted under pressures normally required for adhesion purposes."

Claims 8 and 9 are based on claims 1 and 2, respectively, and provide that the patterns and denture clasp patterns called for in claims 1 and 2, respectively, shall consist "essentially of rosin derivatives and ethyl cellulose".

Claim 19 reads as follows:

"In combination, a model having a surface to which a pattern is adapted to be applied, a ready-made casting pattern adhesively secured to the surface of the model to form on the model a pattern for an article to be cast, said pattern being preformed to cross-sectional dimensions and shape corresponding to the cross-sectional dimensions and shape of the article to be cast and consisting essentially of flexible plastic material eliminatable by heat from a refractory mold, said pattern having sufficient flexibility to be adapted and conformed to the surface of the model and sufficient resistance to distortion with respect to cross-sectional dimensions and shape so as not to become permanently distorted under pressures normally required in

adapting and conforming it to the surface of the model and for adhesion purposes, and said pattern having a surface for application against the surface of the model, both the surface of the pattern and the surface of the model being of adhesive character whereby they are adhesively secured together."

### The Defenses Asserted

The several defenses advanced by the defendants shall be considered as each is particularized herein. The principal defense asserted is that the patent in suit lacks invention in view of the prior art patents and publications. The publications relied on are "The Ney Partial Denture Book" published in 1942 and a publication entitled "Ethyl Cellulose-Resin-Plasticizer Mixtures" which was distributed by the Hercules Powder Company in 1938. The patents relied on consist of U. S. patent No. 2,136,404 to Wheeler dated Nov. 15, 1938; and U. S. patent No. 2,142,039 to Abrams et al. dated December 27, 1938. It is interesting to note, parenthetically, that none of these prior art patents and publications was cited by the United States Patent Office Examiner during the prosecution of the application for the patent in suit.

The evidence discloses that the Ney waxing die kit and the companion publication, "The Ney Partial Denture Book", had a rather wide-spread distribution in the field at least one year prior to the filing date of the application for the patent in suit. It was adequately established at the trial, and a study of the Ney publication would immediately reveal, that the Ney Company taught how to produce ready-made dental casting patterns in the forms of clasps, palatal bars, lingual bars and retention areas which had cross-sectional dimensions and shapes corresponding generally to the cross-sectional dimension and shape of the article to be cast; that these patterns were composed essentially of thermoplastic material; that they were caused to adhere to the dental model through their pressure-sensitive adhesive surface; that these patterns were eliminatable by heat

from the refractory mold and that these patterns had relatively little distortion with respect to cross-sectional dimensions and shape when applied to the dental model under pressures normally required for adhesion purposes.

It is abundantly clear, therefore, that the Ney waxing die plate technique completely anticipated claims 1–3, 6, 7, 13–16, 18 and 19 of the patent in suit.

Additionally, however, the Wheeler patent taught that "resinous materials" could be used as a substitute for dental wax in the preparation of ready-made performed dental casting patterns. The Wheeler patent also taught that other combinations of thermoplastic materials could be used to make the patterns more adhesive and flexible.

The Abrams patent taught that combinations of various resins including ethyl cellulose and rosin derivatives could be used to produce a non-setting, pressure-sensitive adhesive formulation.

The Hercules Powder Company publication entitled "Ethyl Cellulose-Resin-Plasticizer Mixture" discloses various mixtures of ethyl cellulose with particular rosin derivatives and in various proportions and describes the adhesive characteristics of said compositions to various surfaces. This publication also sets forth a series of tables giving the compatibility of ethyl cellulose and various resinous materials.

In addition to this prior art, United States patent No. 2,357,833 to Kropscott and Hunter entitled "Thermoplastic Molding Composition", sets forth typical ethyl cellulose plastic formulations containing ethyl cellulose and resin plasticizers. The proportions of these substances in this patent are such so as to provide a relatively hard type of material.

Thus, the prior art establishes that prior to the application for the patent in suit it was well known that ready-made dental casting patterns could be prepared from wax or from resinous materials; that these ready-made patterns could be made more adhesive and flexible by adding other materials; that combinations of ethyl cellulose and rosin derivatives had been used in the past to provide pressure-sensitive adhesive compositions which could be attached to a variety of materials; and that the characteristics of the resulting material from the standpoint of hardness, tackiness, flexibility, etc., could be varied according to the proportion of ethyl cellulose to rosin derivatives.

In the light of the prior art, therefore, it is evident that Erdle and Schaar, if they had resorted to such prior art, needed only to experiment with the various combinations of ethyl cellulose with rosin derivatives until a particular, desired formulation was found which met the particular needs of the problem presented. I believe it manifest that what Erdle and Schaar did was that which any person skilled in the art would have done. By a process of elimination, trial and error, Erdle and Schaar merely attempted to find the right type of ethyl cellulose, the right type of rosin derivatives and the correct critical proportions of each which, when combined, imparted the desired physical characteristics.

The question thus arises whether Erdle and Schaar advanced "the frontiers of science", General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 249, 66 S.Ct. 81, 84, 90 L.Ed. 43; or pushed "back the frontiers of chemistry, physics and the like", Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 154, 71 S.Ct. 127, 131, 95 L.Ed. 162 (concurring opinion of Mr. Justice Douglas); or revealed "the flash of creative genius, not merely the skill of the calling", Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58. I believe, in view of the prior art, particularly the Ney Process and the prior art disclosed by the Abrams and Wheeler patents, that Erdle and Schaar's contribution to the field falls far short of constituting an invention within the purview of the United States Patent Law and, indeed, far short of the limited scope of invention now given by the United States Supreme Court. I hold, therefore, that

the Erdle and Schaar patent is invalid for want of invention in view of the disclosures of the prior art patents and publications.

▪ In accordance with this holding, I hold that the presumption of validity which attaches to the patent in suit by virtue of its issuance does not stand against this pertinent prior art which was not considered by the Patent Office Examiner. Boynton v. Chicago Hardware Foundry Co., 7 Cir., 77 F.2d 799; Moran v. Protective Equipment, 7 Cir., 84 F.2d 927.

Another principal defense asserted is the contention that the pertinent claims of the patent in suit are invalid as being vague and indefinite.

From the evidence adduced, it appears beyond doubt that to attain the physical characteristics desired in a pattern material it was necessary to use precise chemical formulations of particular materials in certain, specified critical proportions. If this was not done, the pattern would be found to be unsuitable as being "too soft", "too brittle", "lacking in tack", etc. Thus, it seems quite clear that if one used the identical ingredients called for but varied the proportions of the ingredients a fraction of one percent, an unsuitable pattern would result.

Even the most cursory reading of claims 1–3, 6, 7, 13–16, 18 and 19 would immediately reveal that Erdle and Schaar merely set forth therein the physical characteristics desired in the particular dental casting pattern and did not set forth therein the specific compositions which would meet such characteristics. It would seem, therefore, that these claims are vague and indefinite and functional in character since they would cover any conceivable combination of chemical ingredients which either presently exist or which might be discovered in future years and which would impart the desired physical characteristics. By not setting forth in these claims the specific ingredients and their chemical equivalents which the patentees found, when combined in the critical proportions,

would possess the properties and perform the functions set forth in the claims, Erdle and Schaar merely spelled out the problem which was supposed to be solved and did not disclose the actual solution to it. Thus as the Supreme Court stated in Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868, one attempting to use or avoid the use of Erdle and Schaar's discovery, as so claimed and described, "could do so only after elaborate experimentation". Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 257, 48 S.Ct. 474, 479, 72 L.Ed. 868.

As the evidence discloses, the only limitation contained in these claims that could be said to be novel is the following:

"said pattern having sufficient elastic recovery from distortion with respect to cross-sectional dimension and shape so as not to become permanently distorted under pressures normally required for adhesion purposes."

However, it is clear that this limitation, rather than attempting to particularly point out and distinctly claim the subject matter of the alleged invention merely continues the patentees' use of indefinite terminology which the Court of Appeals for this circuit has consistently condemned. Helfrich v. Solo, 59 F.2d 525; Therm-O-Proof Insulation Co. v. Slayter & Co., 80 F.2d 557; National Theatre Supply Co. v. Da-Lite Screen Co., 86 F.2d 454.

The quoted limitation of the patent in suit would seem to be just as objectionable as the limitation:

"Said material being of sufficiently light weight and devoid of free moisture content of sufficient amount to cause bulging or other injurious effects upon the exposed surfaces of said walls"

which was held invalid and void for indefiniteness in the Therm-O-Proof Insulation case, supra, wherein the court stated at page 559 of 80 F.2d:

"Unfortunately for the validity of the claim, greater indefiniteness and

more vagueness could hardly be found. It is so worded (accidentally or intentionally) as to catch an alleged infringer coming or going."

This is precisely the situation in the case at bar—the claims are so worded that an alleged infringer would be caught "coming or going".

Nor do claims 8 to 10 and 17 escape the label of "vagueness" and "indefiniteness" since they merely provide that the particular patterns called for in the other claims shall consist "essentially of rosin derivatives and ethyl cellulose". From the evidence adduced, it appears that there are thousands of compounds coming within the broad designation of "rosin derivatives" and there are equal thousands coming within the category of "ethyl cellulose". It is equally clear, also, that the thousands of compounds that come within these two categories possess different physical and chemical characteristics, so that when these compounds are combined in any given proportion, literally thousands of different results would be attained depending on the particular compounds used and the critical proportions selected. Thus, it is quite apparent that claims 8 to 10 and 17 of the patent in suit are vague and indefinite in that they fail to specify the particular rosin derivatives, particular grade of ethyl cellulose, and the particular critical proportions thereof, which, when mixed, would impart the required characteristics set forth in the claims.

I hold, therefore, that all of the claims relied on in the instant case (that is, claims 1–3, 6–10, and 13–19) are invalid and void as being vague and indefinite.

Still another defense asserted is that the specification of the patent in suit is so vague and indefinite that a person skilled in the art could not use the alleged invention. Section 112 of Title 35 U.S.C. provides that:

"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same * * *."

In the application for the patent in suit, Erdle and Schaar set forth five pattern examples, Pattern Examples I to V, which they thought were suitable dental pattern material formulations. In this application, Erdle and Schaar disclosed in Pattern Examples I to V particular ingredients having particular physical and chemical characteristics—this was done by enumerating the trade names applied to these materials. Later the Patent Office Examiner called on the applicants to give the precise chemical formulas or particular chemical names for such compounds. Thereafter, Schaar submitted his affidavit to the Examiner that the chemical formulas and chemical names were the precise formulas or chemical names for the particular trade marked compounds. Notwithstanding this, however, it was convincingly established, not only by defendants' evidence but plaintiff's as well, that the substituted formulas and chemical names were broad and indefinite and encompassed hundreds, if not thousands, of possible compounds. The evidence establishes that Pattern Examples I to V set forth such a broad category of compounds that a man skilled in the art, with just the patent in suit before him, would be unable to select the particular ingredients or materials which would impart the desired characteristics.

It follows that the specification is vague and indefinite in that it fails to teach a man skilled in the art the particular compounds which should be utilized in preparing patterns according to any one of the examples set forth in the specification. And the authorities are uniform in holding that where the disclosure of the patent is so vague and indefinite that it leaves the alleged invention in the realm of speculation requiring further experimentation in order to achieve the desired result, the patent should be held void. Johns-Manville Corp. v. Ludowici-Celadon Co., 7 Cir., 117 F.2d 199; Standard Brands, Inc., v. National Grain Yeast

Corp., 3 Cir., 101 F.2d 814; Ingersoll Milling Machine Co. v. General Motors Corp., D.C.N.D.Ill., 110 F.Supp. 12.

There is, however, still another reason why the specifications therein render the instant patent invalid. The specifications of the patent, by Pattern Examples I through III inclusive, state that the admixtures of ethyl cellulose and resin derivatives should be heated to a temperature "from about 275° F to about 300° F, or higher". (It should be observed at this time that Pattern Examples IV and V apparently have been completely abandoned as no one has ever attempted the use of asphalt in making the patterns which are the subject of the suit.) In recommending these maximum temperatures, it seems clear that Erdle and Schaar were merely conforming to the generally understood and well known limitations placed upon the heating of ethyl cellulose. (See the Hercules Powder Company publication entitled "Ethyl Cellulose", which was received in evidence as defendants' Exhibit 37.) It was generally understood that if ethyl cellulose was heated above 300° F., it resulted in a degradation of the cellulosic chain, a corresponding reduction in viscosity, a partial decomposition of the molecule, and a caramelization of the sucrose thereby produced.

During the trial of the case, it was convincingly established, even through the plaintiff's inter-partes tests conducted by Professor Selheimer, that in order even to attempt to attain the desired results contemplated by Pattern Examples I through III, it was necessary to heat the mix up to temperatures approximating 450° F. for periods of about thirty minutes either in the injection molding machine or during the compounding thereof. This most important step, which departed from the generally recognized procedure, was completely omitted from the specification of the patent in suit. The importance of the overheating step is borne out by the fact that, if the mix was heated only to the recommended temperatures, the patterns were clearly unsuitable. As a consequence, the plaintiff's expert had to resort to the higher temperatures in order to produce anything approaching an acceptable pattern. Nor can the plaintiffs find comfort in the words "or higher" which follow the recommended numerical temperatures, since these words, when read together with the recommended temperatures, merely contemplate, of their very nature, a relatively slight increase and do not come close to suggesting that temperatures approaching 450° F. must be used. It seems clear from the evidence adduced that Erdle and Schaar discovered the necessity of the overheating step well after the patent in suit was applied for. In fact, I believe the patent as issued demonstrates that the patentees were still experimenting when the patent was issued.

Finding that the overheating step is extremely essential in the production of suitable pattern materials in accordance with the patentees' own Pattern Examples I through III, I find that the patentees' failure to disclose this important step renders the patent invalid and void.

The next defense asserted and, perhaps, the defense that bolsters and affirms the defenses hereinbefore set forth, is the defense that both plaintiff's and defendants' inter-partes tests show that a man skilled in the art, who tried conscientiously to follow the teachings of the patent in suit, would be unable to produce patterns having the physical characteristics claimed.

Defendants' expert, Dr. Gayer, conducted two types of tests. The first type was directed towards verifying the efficacy of the Pattern Material Examples I, II and III of the patent in suit, and the second type was the so-called "special Mix" tests which were limited to the admixtures of only ethyl cellulose and resin derivatives. The record is clear that Dr. Gayer found Pattern Examples I, II and III of the instant patent so indefinite that he could identify only two ingredients from these pattern examples. As a result, he found it necessary to refer back to the file history for all of the other ingredients. The record is also clear that, despite his efforts, Dr. Gayer was unable

to produce patterns having the physical characteristics claimed in Pattern Examples I through III. It is abundantly clear, therefore, that defendants' tests establish that a man skilled in the art would be unable, by following the teachings of the patent in suit, to produce ready-made dental casting patterns possessing the physical characteristics set forth in the claims of the patent in suit.

I find plaintiff's attack upon Dr. Gayer's good faith in conducting these tests to be unsupported by the facts and totally unfounded.

My ruling concerning defendants' tests gains added, but unneeded, support from the fact that the record also reveals that plaintiff's inter-partes tests show that plaintiff's expert, Professor Selheimer, was unable to produce commercially satisfactory patterns in accordance with the patent in suit. Plaintiff's expert found it necessary to depart from the teachings of the patent in at least two different respects:

(1) He substituted materials not called for in the patent (Staybelite Ester No. 2, RG–2) ; and

(2) he had to resort to temperatures up to 450° F., which, as has been indicated, are far in excess of the maximum temperatures recommended in the patent.

Even with these departures from the teachings of the patent, Professor Selheimer was unable to produce acceptable commercial patterns. Thus, if plaintiff's own expert is unable to produce satisfactory patterns by following the teachings of the patent and if he cannot produce acceptable commercial patterns after having substituted materials not called for and after resorting to a step not disclosed by the patent, it follows that the patentees did not disclose in the patent information which was sufficiently precise and complete to enable the members of the field to practice the invention when it expired. Since both parties' inter-partes tests show that commercially acceptable patterns cannot be produced in accordance with the patent's teachings, I hold that the patent must be held invalid for lack of invention in failing to teach anything usable in the art.

Concerning the question of infringement, it seems clear that this issue, too, must be resolved for the defendants. As has been indicated, the evidence clearly shows that it is impossible to produce commercially acceptable patterns according to the teachings of the patent in suit. It would be equally impossible for the defendants to possess the commercial success that they do enjoy if they manufactured their product in accordance with the teachings of the instant patent. Furthermore, the evidence also reveals that, except in the broadest sense, neither plaintiff nor the defendants follow the teachings of the patent. In fact, plaintiff's commercial formulations were evidently considered by it to be such an important trade secret that it refused to disclose the same until this Court so directed by its order of February 24, 1955. This, perhaps, best explains plaintiff's commercial success because it is quite evident that plaintiff would not enjoy that success if it confined itself to manufacturing in accordance with the teachings of the patent in suit. Accordingly, the issue of noninfringement must be decided for the defendants.

It is accordingly ordered, adjudged and decreed, for the reasons stated, that Claims 1 to 3, 6 to 10, and 13 to 19, all inclusive, of the Erdle and Schaar patent, here in suit, are held invalid and also not infringed, and the case is dismissed at plaintiff's costs.

### Findings of Fact

1. This is an action for infringement of claims 1–3, 6–10 and 13–19 of patent No. 2,461,416 issued February 8, 1949, to plaintiff, Austenal Laboratories, Inc., as assignee of Reiner W. Erdle and Charles H. Schaar.

2. Plaintiff, Austenal Laboratories, Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of New York and is and has been the owner of all right, title and interest in the Erdle & Schaar patent No.

2,461,416 since the issuance of said patent on February 8, 1949.

3. Defendant, Nobilium Processing Company of Chicago, is a corporation duly organized and existing under and by virtue of the laws of the State of Illinois, having its offices and principal place of business in Chicago, Illinois.

4. Defendant, Nobilium Products, Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of Pennsylvania and has a regular and established place of business at Chicago, Illinois.

5. Defendant, Alloys & Plastics, Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of Illinois, having its offices and place of business in Chicago, Illinois.

6. Intervener-Defendant, Julius Aderer, Inc., is a corporation duly organized and existing under and by virtue of the laws of the State of New York and has a regular and established place of business at Chicago, Illinois.

7. The patent in suit is entitled "Pattern Material, Pattern, and Method" and was issued on an application filed by Reiner W. Erdle and Charles H. Schaar on December 2, 1944.

8. Long prior to the alleged invention of the patent in suit certain repeatable common sections of dental casting patterns were prepared with various types of "wax wires" of either half-round, round or pear-shaped cross-section. These wax wires were prepared by the dental laboratory by means of a hand extrusion device with interchangeable nozzles having an orifice corresponding to the desired cross-section. Such a typical hand extrusion device and the longitudinal sections extruded therefrom is in evidence as defendants' Exhibit 2. These performed wax casting patterns were used by the dental laboratories to form palatal bars, lingual bars, retention areas and clasps.

9. Long prior to the alleged invention of the patent in suit the Kerr Manufacturing Company of Detroit, Michigan, manufactured and sold an assortment of ready-made preformed wax sections having round, half-round or pear-shaped cross-section which were used by the dental laboratories to form palatal bars, lingual bars, retention lines and areas and clasps. Such a box of Kerr ready-made forms is in evidence as defendants' Exhibit 35.

10. In March 1942, the J. M. Ney Company, offered for sale and sold to dentists, dental laboratories and dental colleges a "Ney Waxing Die Kit" (defendants' Exhibit 31) which contained all the materials required for the preparation of ready-made dental casting patterns according to the Ney waxing die technique.

11. In March 1942, which was more than one year prior to the filing date of the application for the patent in suit, The J. M. Ney Company published and widely distributed to dentists, dental laboratories and dental colleges, a booklet entitled "The Ney Partial Denture Book", a copy of which is in evidence as plaintiff's Exhibit 40. This publication contains a complete description of the procedure to be followed in preparing ready-made dental casting patterns in the Ney waxing die plate and in adapting and adhering such patterns to a refractory model to form on the model a pattern for the article to be cast.

12. The Ney wax patterns produced in the Ney waxing die plate were "for application to dental models to form on the model a pattern for an article to be cast."

13. The Ney ready-made casting patterns were of "cross-sectional dimensions and shape corresponding generally to the cross-sectional dimensions and shape of the article to be cast."

14. The Ney patterns were composed essentially and throughout of thermoplastic material and were eliminatable by heat from refractory molds.

15. The dental casting patterns prepared according to the Ney waxing die technique had a non-setting surface and were caused to adhere to the beeswax coated refractory model by means of the

pressure-sensitive adhesive action between the model and pattern surface.

16. The Ney patterns had sufficient body with respect to cross-sectional dimension and shape so as not to become harmfully distorted under pressures normally required for adhesion purposes.

17. The ready-made preformed wax patterns prepared according to the Ney waxing die technique had "sufficient resistance to distortion with respect to cross-sectional dimensions and shape so as not to become permanently distorted under pressures normally required for adhesion purposes," as called for by claims 15, 16, 18 and 19 of the patent in suit.

18. Claims 1–3, 6–7, 13–16, 18 and 19 of the patent in suit are completely anticipated by the Ney waxing die plate and associated technique which was in public use for more than one year prior to the filing date of the application for the patent in suit, and which was completely described in the Ney booklet entitled "The Ney Partial Denture Book", which was published more than one year prior to the filing date of said application.

19. Claims 1–3, 6–7, 13–16, 18 and 19 of the patent in suit are invalid for want of invention in view of the Ney waxing die technique.

20. The claims in suit of patent No. 2,461,416 do not describe a patentable invention under 35 U.S.C. § 101.

21. Defendants have cited the following prior art patents and publications as anticipations of the Erdle and Schaar patent in suit, and as showing that it did not amount to invention to do what Erdle and Schaar did, having in mind the teachings of such prior art patents and publications:

U. S. Patent No. 1,359,919 dated November 23, 1920 to Reardon

U. S. Patent No. 2,021,058 dated November 12, 1935 to Harrison

U. S. Patent No. 2,057,289 dated October 13, 1936 to Bridlebough et al.

U. S. Patent No. 2,142,039 dated December 27, 1938 to Abrams et al.

U. S. Patent No. 2,136,404 dated November 15, 1938 to Wheeler

U. S. Patent No. 2,296,877 dated September 29, 1942 to Slack, Jr.

U. S. Patent No. 2,338,802 dated January 11, 1944 to Decker

U. S. Patent No. 2,357,833 dated September 12, 1944 to Kropscott et al.

"Ethyl Cellulose-Resin-Plasticizer Mixtures", Hercules Powder Company, 1938

"Technology of Natural Resins" by C. L. Mantell, 1942, pages 421, 429 and 435

"Synthetic Adhesives" by Smith, 1943

"Dental Formulary" by Hermann Prinz, 1930

22. U. S. Patent No. 2,136,404 to Wheeler taught that ready-made dental casting patterns could be prepared from resinous materials and that such patterns could be made more adhesive and flexible by the addition of other resinous materials.

23. U. S. Patent No. 2,142,039 to Abrams et al. clearly taught that admixtures of various resins, including ethyl cellulose and rosin derivatives, could be utilized to produce a formulation which possessed a non-setting, pressure-sensitive adhesive surface.

24. The Hercules Powder Company publication entitled "Ethyl Cellulose-Resin-Plasticizer Mixtures", discloses various mixtures of ethyl cellulose with particular rosin derivatives and in various proportions and describes the adhesion of such formulations to various surfaces, including plaster and cellophane.

25. The selection of the particular resins and the combination of the same in particular proportions in order to impart the physical characteristics described and claimed in the Erdle & Schaar patent in suit did not constitute an invention in view of the prior art patents and publications which are relied upon by the defendants.

26. The selection of the particular ethyl cellulose polymer and the particular rosin derivatives which when combined in particular proportions will impart the physical characteristics described and

claimed in the patent in suit, did not involve invention within the purview of the patent laws.

27. Claims 8–10 and 17 of the patent in suit are lacking in invention as they do not describe any novel composition of matter which could not be found by any man skilled in the art, having the benefit of the prior art teachings, including the Wheeler and Abrams patents and the Ney Company and the Hercules Powder Company publications, which are relied upon by the defendants, merely by the exercise of his ordinary skills.

28. The deposition of Reiner W. Erdle, one of the patentees of the patent in suit, clearly shows that claims 1–3, 6–7, 13–16, 18 and 19 of the patent in suit are invalid because they do nothing more than state the problem to be solved without claiming the particular chemical formulations which resulted in the solution of the problem.

29. The particular chemical compounds and the proportions of the same which will impart the desired physical characteristics set forth in the claims of the patent in suit can only be found after extensive experimentation.

30. The percentages of the particular chemical ingredients of a dental pattern material formulation are exceedingly critical. A variation as small as 1½% of three of the ingredients in plaintiff's current commercial formulation was sufficient to render it unsuitable as a pattern material formulation.

31. Plaintiff, Austenal Laboratories, Inc., found it necessary to conduct extensive experimentation for a period of approximately one year after the filing date of the application for the patent in suit before it was able to discover the particular chemical ingredients and the critical proportions of each such ingredient which must be admixed in order to prepare a commercially suitable dental casting pattern formulation.

32. When plaintiff was informed that two of the ingredients of its initial commercial formulation (Paraplex AP–16 and Pentacizer 344) would no longer be available, one of its chemists, Edward Dahowski, found it necessary to conduct numerous experiments with a wide variety of substitute materials extending over a period of approximately one year, before he was able to evolve another commercially suitable formulation.

33. Claims 1–3, 6–7, 13–16, 18 and 19 of the patent in suit are purely functional in that they merely set forth the physical characteristics of the desired dental casting pattern instead of the particular chemical compositions which will impart such characteristics.

34. Claims 1–3, 6–7, 13–16, 18 and 19 of the patent in suit are invalid for the reason that they are not limited to the particular formulations and their chemical equivalents which are set forth in the specification but are so broad as to encompass within their scope any chemical formulation which may presently exist or which may subsequently be made from materials not within any defined range described in the patent but which will impart the physical characteristics set forth in these claims.

35. Claims 1–3, 6–7, 13–16, 18 and 19 of the patent in suit are invalid because they fail to particularly point out and claim the advance in the art allegedly made by Erdle & Schaar, as required by Sec. 112 of the United States Patent Law. 35 U.S.C. § 112.

36. The only limitation of the claims in suit which is supposed to differentiate from the prior art i.e. "said pattern having sufficient elastic recovery from distortion with respect to cross-sectional dimension and shape so as not to become permanently distorted under pressures normally required for adhesion purposes" is so vague and indefinite that it renders the claims invalid for failure to comply with the requirements of Sec. 112 of the United States Patent Law. 35 U.S.C. § 112.

37. The chemical expression "ethyl cellulose" encompasses within its scope many thousands of ethyl cellulose polymers having a wide range of physical and chemical characteristics.

38. The chemical expression "rosin derivatives" encompasses within its scope many thousands of rosin derivatives of varying physical and chemical characteristics.

39. A great number of ethyl cellulose polymers would not, when admixed with particular rosin derivatives, produce a dental pattern material formulation having the physical characteristics called for by claims 1–3 and 16 of the patent in suit.

40. A great number of rosin derivatives would not, when admixed with particular ethyl cellulose polymers, produce a dental pattern material formulation having the physical characteristics called for by claims 1–3 and 16 of the patent in suit.

41. Pattern material—Examples IV and V do not contain any ethyl cellulose or rosin derivatives.

42. Pattern material—Examples I, II and III do not consist solely of ethyl cellulose and rosin derivatives, but contain other ingredients which are necessary to impart to the formulation the desired physical characteristics.

43. The inter-partes tests conducted by Dr. Gayer on Special Mix formulations 1 to 5 (consisting solely of ethyl cellulose and rosin derivatives) clearly show that suitable preformed dental casting patterns can not be prepared from formulations consisting of ethyl cellulose and the particular rosin derivatives which are set forth in the specification (as clarified by the file history) of the patent in suit.

44. The inter-partes tests conducted by Professor Selheimer on Special Mix formulations 1 and 2 (consisting solely of ethyl cellulose and rosin derivatives) resulted in the production of patterns which did not have the physical characteristics called for by the claims 1–3 and 16 of the patent in suit.

45. Claims 8–10 and 17 are invalid because they are broader than the alleged invention.

46. Claims 8–10 and 17 are invalid because they include numerous combinations of rosin derivatives and ethyl cellulose which will not impart the physical characteristics required by claims 1–3 and 16 of the patent in suit.

47. The following prior art patents and publications which are considered most pertinent were not considered by the United States Patent Office during the prosecution of the application for the patent in suit:

"The Ney Partial Denture Book", The J. M. Ney Company, 1942;

"Ethyl Cellulose-Resin-Plasticizer Mixtures", Hercules Powder Company, 1938;

"Ethyl Cellulose", Hercules Powder Company, 1937;

U. S. patent No. 2,136,404 dated November 15, 1938 to Wheeler

U. S. patent No. 2,142,039 dated December 27, 1938 to Abrams et al.

48. The Ney waxing die technique of preparing ready-made dental casting patterns and adhering the same to a refractory model was not disclosed to nor was it considered by the Patent Office Examiner during the prosecution of the application for the patent in suit.

49. The application for the patent in suit was misclassified during its prosecution and was issued by the wrong division of the United States Patent Office.

50. It is well known and understood by those skilled in the art of plastics and resin chemistry (primarily through the manufacturer's warnings), the ethyl cellulose formulations should never be heated above 350° F. and preferably not above 312° F., (the softening point of ethyl cellulose).

51. The important step of overheating the ethyl cellulose formulations, contrary to the well understood practice in the art, in order to obtain patterns possessing a "non-setting" surface was not disclosed to the public in the specification for the patent in suit.

52. Ester gum is a glycerol ester of resin.

53. The term "hydrogenated rosin" appearing in parenthesis after the chemical compound "ester gum" in Pattern mate-

rial—Examples II and III does not fall within the general category of "ester gums".

54. The chemical expression "ester gum" (preferably hydrogenated rosin) appearing in Pattern material—Examples II and III is a chemically inconsistent expression which fails to set forth the particular chemical ingredient to be used in said examples.

55. The majority of the chemical ingredients set forth under Pattern material—Examples I–V are so broad and indefinite that these examples fail to teach a man skilled in the art what particular compounds to use in the preparation of suitable preformed dental casting patterns according to any one of such examples.

56. The inter-partes tests conducted by defendants clearly show that it is impossible for a man skilled in the art to prepare dental casting patterns according to examples I, II and III of the patent in suit which possess the physical characteristics called for by the claims of said patent.

57. Dr. Gayer was unable to ascertain from the chemical description of the ingredients set forth under Pattern material—Examples I, II and III (with the exception of ethyl cellulose and Amberol No. 800) which particular chemical ingredients to use in preparing pattern material formulations according to such examples. In each instance he found it necessary to go back to the file history of the application for the patent in suit and use the particular trade named ingredients therein set forth, or if such compositions were no longer available, he used a suitable substitute material.

58. The Paraplex G–25 which Dr. Gayer used in the formulation which he prepared in accordance with Pattern material—Example I of the patent in suit (as clarified by the file history) is one of the sebacic acid-ethylene glycol polymers called for by the Paraplex Polymer formula set forth in said example.

59. The "Staybelite Rosin" which Dr. Gayer used in the formulation which he prepared in accordance with Pattern material—Examples II and III of the patent in suit (as clarified by the file history) was the exact compound specified in the file history of said application and was the exact material with which the patentees experimented prior to the filing date of the application for the patent in suit.

60. The pattern material formulations compounded by Professor Selheimer during plaintiff's inter-partes tests were not made in accordance with Pattern material—Examples I, II and III of the patent in suit. In his test on Pattern material—Example I, Professor Selheimer used Paraplex RG–2 (a glycerol ester of sebacic acid) and not an ethylene glycol of ester of sebacic acid as called for by said example. In his tests on Pattern material—Examples II and III, Professor Selheimer added "Staybelite Ester No. 2" to the formulation, which compound is nowhere referred to in the specification for the patent in suit nor in the file history (which specifies "Staybelite rosin").

61. During the molding of patterns from its alleged Pattern material—Examples I and III formulations, plaintiff went contrary to the teachings of the patent in suit and the well-understood practice in the art and actually heated the formulations to temperatures as high as 450° F in the molding apparatus prior to the production of patterns therefrom, thereby decomposing the ethyl cellulose present in such formulations.

62. Even with the substitution of materials nowhere referred to in Pattern material—Examples I, II and III of the patent in suit and even though plaintiff overheated its alleged pattern examples I and III formulations, it was unable to produce patterns possessing the physical characteristics called for by the claims of the patent in suit.

63. Plaintiff has never commercially manufactured and sold dental casting patterns prepared according to the disclosures of any one of the pattern material examples set forth in the specification for the patent in suit.

64. Plaintiff has never commercially manufactured and sold dental casting patterns consisting solely of ethyl cellulose and rosin derivatives but has always found it necessary to add other essential ingredients.

65. Plaintiff has consistently adhered to its company policy of maintaining the commercial formulations for its "Flexseal" preformed dental casting patterns as a "trade secret".

66. Plaintiff's commercial success with respect to its "Flexseal" dental casting patterns is attributable to its "secret formulations" and not to the disclosures of the patent in suit.

67. The "Nobilforms" dental casting patterns manufactured and/or used and/or sold by the defendants do not consist essentially of rosin derivatives and ethyl cellulose. Defendants have always found it necessary to add other essential ingredients in order to impart the desired characteristics.

68. The "Cast Forms" dental casting patterns manufactured and sold by the intervener-defendant do not consist essentially of rosin derivatives and ethyl cellulose. Intervener-defendant has always found it necessary to add other essential ingredients in order to impart the desired characteristics.

69. Only plaintiff's "franchised licensees" are given the confidential information concerning the necessary step of applying a "protective coat" over the dental casting pattern prior to investing the same when such patterns are used in the preparation of chrome-cobalt metal dentures. This vital information was omitted from the specification for the patent in suit.

## Conclusions of Law

1. This Court has jurisdiction of the parties and of the subject matter of this action.

2. Claims 1–3, 6–10 and 13–19 of the patent in suit are invalid for the reason that the invention therein disclosed was fully anticipated by the prior art, and would have been obvious to a man skilled in the art having before him the prior art patents and publications relied upon by the defendants.

3. Claims 1–3, 6–7, 13–16, 18 and 19 of the patent in suit are invalid and void for the reason that ready-made dental casting patterns having the physical characteristics therein claimed were in public use and were described in a printed publication, "The Ney Partial Denture Book", more than one year prior to the date of the application for the patent in suit. 35 U.S.C. § 102 (a, b).

4. Claims 1–3, 6–7, 13–16, 18 and 19 are invalid and void for the reason that they merely state the problem to be solved and do not claim the particular chemical formulations which resulted in the solution of such problem.

5. Claims 1–3, 6–7, 13–16, 18 and 19 are invalid and void for the reason that they define the alleged invention in vague, indefinite and functional terminology and fail to particularly point out and claim the alleged novel advance over the prior art. 35 U.S.C. § 112.

6. Claims 8–10 and 17 are invalid and void for the reason that they are broader than the alleged invention and include within their scope innumerable combinations of rosin derivatives and ethyl cellulose which will not impart the physical characteristics which are required by claims 1–3 and 16.

7. Claims 1–3, 6–10 and 13–19 of the patent in suit are invalid and void for the reason that the specification for such patent fails to describe the manner and process of making and using the alleged invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, * * * to make and use the same * *." 35 U.S.C. § 112.

8. The ready-made preformed dental casting patterns and the method for using the same described in the patent in suit does not represent discovery or invention within the meaning of the Patent Law.

9. There is no presumption of validity attaching to the patent in suit for the reason that the Patent Office Examiner

failed to consider the Ney waxing die plate and associated technique and also failed to consider the most pertinent prior art patents and publications (which are here relied upon) during the prosecution for the application of the patent in suit.

10. Claims 1–3, 6–10 and 13–19 of the patent in suit are invalid.

11. Claims 1–3, 6–10 and 13–19 of the patent in suit are not infringed by the "Nobilforms" casting patterns manufactured, and/or used, and/or sold by the defendants, Nobilium Processing Company of Chicago, Nobilium Products, Inc. and Alloys & Plastics, Inc.

12. Claims 1–3, 6–10 and 13–19 of the patent in suit are not infringed by the "Cast Forms" casting patterns manufactured and sold by the intervener-defendant, Julius Aderer, Inc.

13. The defendants may recover Court costs and the costs of this suit.